## PENN-CENTRAL MERGER AND N & W INCLUSION CASES.

Decided January 15, 1968.*

*No. 778, *Baltimore & Ohio Railroad Co. et al.* v. *United States et al.;* No. 779, *Norfolk & Western Railway Co.* v. *United States et al.;* No. 830, *Oscar Gruss & Son* v. *United States et al.;* No. 831, *New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee et al.* v. *United States et al.;* No. 832, *Erie-Lackawanna Railroad Co. et al.* v. *United States et al.;* No. 833, *Boston & Maine Corp.* v. *United States et al.;* No. 834, *Reading Co.* v. *United States et al.;* No. 835, *City of Scranton et al.* v. *United States et al.;* and No. 836, *John Hancock Mutual Life Insurance Co. et al.* v. *United States et al.,* on appeal from the United States District Court for the Southern District of New York, argued December 4, 1967. No. 433, *City of Pottsville* v. *United States et al.,* on appeal from the United States District Court for the Middle District of Pennsylvania; No. 663, Misc., *Borough of Moosic* v. *United States District Court for the Middle District of Pennsylvania et al.;* and No. 664, Misc., *City of Scranton et al.* v. *United States District Court for the Middle District of Pennsylvania et al.,* on motions for leave to file petitions for writs of mandamus and/or certiorari to the United States District Court for the Middle District of Pennsylvania.

488

*Howard J. Trienens, Myron S. Isaacs, Edward A. Mc-Dermott, Ernest R. von Starck, Gordon P. MacDougall, Malcolm Fooshee* and *Lester C. Migdal* argued the cause for appellants in Nos. 778, 779, 830–836.

*Solicitor General Griswold* argued the cause for the United States et al. in Nos. 778, 779, 830–836.

*Thomas D. Barr, Harry G. Silleck, Jr., Joseph Auerbach* and *Hugh B. Cox* argued the cause for the remaining appellees in Nos. 778, 779, 830–836.

With *Mr. Trienens* on the briefs for Baltimore & Ohio Railroad Co. et al. were *Richard J. Flynn, George L. Saunders, Jr., Lloyd N. Cutler, Daniel K. Mayers* and *Edward K. Wheeler.* With *Mr. Trienens* on the briefs for Norfolk & Western Railway Co. were *Messrs. Flynn, Cutler, Mayers* and *Albert Ritchie.* With *Mr. Isaacs* on the briefs for Oscar Gruss & Son was *Homer Kripke.* With *Mr. Migdal* on the briefs for New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee was *Lawrence W. Pollack.* With *Mr. Mc-Dermott* on the briefs for Boston & Maine Corp. was

*James A. Belson.* With *Mr. von Starck* on the briefs for Reading Co. was *H. Merle Mulloy.* With *Mr. Mac-Dougall* on the briefs for the City of Scranton et al. were *Harvey Gelb, Israel Packel* and *Leon H. Keyserling. Mr. MacDougall* was on the briefs for the City of Pottsville and the Borough of Moosic. With *Mr. Fooshee* on the briefs for John Hancock Mutual Life Insurance Co. et al. were *Carl E. Newton, M. Lauck Walton* and *Ben Vinar.*

With *Solicitor General Griswold* on the briefs for the United States et al. were former *Solicitor General Marshall, Assistant Attorney General Turner, Ralph S. Spritzer, Louis F. Claiborne, Howard E. Shapiro, Robert W. Ginnane, Fritz R. Kahn, Leonard S. Goodman, Betty Jo Christian* and *Jerome Nelson.*

With *Mr. Barr* on the briefs for Erie-Lackawanna Railroad Co. were *Harry H. Voigt, Eldon Olson, John M. Linsenmeyer* and *J. Kenneth Campbell. Mr. Silleck* was on the briefs for Delaware & Hudson Railroad Corp. With *Mr. Auerbach* on the briefs for Smith et al., trustees of the property of New York, New Haven & Hartford Railroad Co., were *James Wm. Moore, Robert W. Blanchette, Arthur Blasberg, Jr., Robert G. Bleakney, Jr., Morris Raker* and *Robert M. Peet.* With *Mr. Cox* on the briefs for Pennsylvania Railroad Co. and New York Central Railroad Co. were *Henry P. Sailer, Windsor F. Cousins, Ulrich Schweitzer, Gerald E. Dwyer, James B. Gray, Edward F. Butler* and *David J. Mountan, Jr. Louis J. Lefkowitz,* Attorney General, *Dunton F. Tynan,* Assistant Solicitor General, *Mortimer Sattler,* Assistant Attorney General, and *Walter J. Myskowski* filed briefs for the State of New York. *Arthur J. Sills,* Attorney General, and *William Gural,* Deputy Attorney General, filed a brief for the State of New Jersey. *Robert K. Killian,* Attorney General of Connecticut, *Samuel Kanell,* Special Assistant Attorney General, *William J. Lynch,*

*Elliot L. Richardson,* Attorney General of Massachusetts, *Howard M. Miller,* Assistant Attorney General, *Herbert F. DeSimone,* Attorney General of Rhode Island, and *Robert M. Schacht,* Assistant Attorney General, filed a brief for their respective States. *William G. Mahoney* and *William J. Hickey* filed a brief for the Railway Labor Executives' Association.

*William C. Sennett,* Attorney General, *Edward Friedman,* Counsel General, and *Edward Munce* and *Robert M. Harris,* Assistant Attorneys General, filed a brief for the Commonwealth of Pennsylvania, as *amicus curiae.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

These cases again bring before us problems arising from the program to merge the Pennsylvania and New York Central railroads and related problems proceeding from an Interstate Commerce Commission order that certain railroads be included in the Norfolk & Western (N & W) system. The merger and the inclusion orders are part of a vast reorganization of rail transportation implementing the congressional policy of encouraging consolidation of the Nation's railroads into a "limited number of systems." Section 407 of the Transportation Act of 1920, amending § 5 (4) of the Interstate Commerce Act, 41 Stat. 481. That policy has been with us, in one form or another, for more than 45 years. The original idea of the 1920 Act, that the ICC would formulate a national plan of consolidation, proved unworkable. It ran into heavy opposition from carriers and eventually had to be abandoned. The 1920 Act was replaced by the Transportation Act of 1940, 54 Stat. 898. Section 5 (2)(b) of the Interstate Commerce Act, as amended by the 1940 Act, 54 Stat. 906, 49 U. S. C. § 5 (2)(b), governed the Commission's examination of the present transactions. Under the 1940 Act, the initiation of

merger and consolidation proceedings is left to the carriers themselves, and the Commission possesses no power to compel carriers to merge. However, the congressional directive for a limited number of railroad systems has not been changed. The only change has been in the means of achieving that goal. See generally *St. Joe Paper Co. v. Atlantic Coast Line R. Co.*, 347 U. S. 298, 315–321 (Appendix) (1954).

The Pennsylvania and the New York Central dominate rail transportation in the Northeast. Their freight operations extend over some 20,000 miles of road in 14 States and Canada. They are the two largest passenger carrying railroads in the United States. In 1965 their combined operating revenue surpassed $1,500,000,000 and their combined net income was more than $75,000,000. As independent lines, Pennsylvania and New York Central are, to some extent, in direct competition for rail traffic. There are 32 urban areas in which the two lines are in competition with each other and in which no other rail facilities are available. The two roads operate at 160 common points or junctions and have a substantial amount of parallel trackage and routes. The proposed merger which the ICC has approved contemplates the unification of these vast roads and, as time goes on, the rationalization and elimination of some of the dual facilities and services in various areas and in various respects. The merger will result in "enormous savings in transit time." It is estimated that in eight years, the savings in expense will amount to more than $80,000,000 annually. See *Baltimore & Ohio R. Co. v. United States*, 386 U. S. 372, 379–381 (1967).

At the same time the combination of these two roads will directly and adversely affect various smaller railroads in the service area because of the more effective competitive service that the combined system will offer and

because of the tendency of the combined roads, unless restrained by law, to favor their own system rather than to share traffic by interchange with nonsystem roads.

In brief, the antecedents of the issues before us are as follows: the Penn-Central merger has been under consideration by the parties and the Commission for about 10 years. It was preceded by the vast N & W-Nickel Plate merger, which the Commission approved in 1964. That transaction, which, it is anticipated, will eventually produce savings for the N & W system of over $29,000,000 annually, resulted in a large rail network covering some 7,000 miles of track and extending in the north from Des Moines and Kansas City to Buffalo and Pittsburgh, and in the southern tier from Cincinnati to Norfolk. See *Norfolk & Western Railway Co. and New York, Chicago & St. Louis Railroad Co.—Merger, etc.,* 324 I. C. C. 1 (1964). The transaction was not presented to this Court for review.

In 1962 the parties to the Penn-Central transaction signed an agreement of merger including 36 rail carriers. The merger agreement did not include the New York, New Haven & Hartford Railroad (NH), although that road requested inclusion.

Following the merger agreement, the parties submitted the proposal to the Commission for approval under § 5 (2) of the Interstate Commerce Act. Exhaustive hearings were held in which States, municipalities, railroads, shippers, and public bodies—some 200 parties in all—took part. The Commission's own staff participated extensively as did the Department of Justice acting for affected interests of the United States other than the regulatory functions of the Commission. All participants, with relatively minor exceptions to which we shall later advert, agreed that the merger itself would be in the public interest. There were sharp differences, however, with respect to certain issues. These primarily concerned the

provisions to be made for three smaller lines affected by the proposed merger: the Erie-Lackawanna (E–L), Delaware & Hudson (D & H), and Boston & Maine (B & M) railroads. The Commission approved immediate consummation of the merger, subject to a reservation of jurisdiction to establish protective provisions for the three roads. *Pennsylvania Railroad Co.— Merger—New York Central Railroad Co.*, 327 I. C. C. 475 (1966). Its order was approved by a three-judge court in the Southern District of New York. *Erie-Lackawanna R. Co. v. United States*, 259 F. Supp. 964 (1966).

At the last Term of Court, we reversed. We noted that the Commission itself had found that the survival of the E–L, D & H, and B & M was essential to the public interest and that these roads would be so seriously affected by the competition of the merged company that they might not be able to survive unless adequate protective arrangements were made. In these circumstances we concluded that the Commission should have determined the means to preserve the "protected roads," on both an interim and a permanent basis, before permitting consummation of the merger. We expressly stated that we were not passing upon the validity of the merger or the "peripheral points posed by the various parties." *Baltimore & Ohio R. Co. v. United States, supra,* at 378.

The Court noted that in 1965 each of the three "protected roads" had filed applications for inclusion in the N & W system, and that these were pending before the Commission in the N & W-Nickel Plate merger case pursuant to the Commission's continuing jurisdiction over those proceedings. We further noted that the Commission, pursuant to its power under § 5 of the Act to require as a condition of approval of a merger that other railroads be included in the merger, had obligated the merged N & W system to include the E–L, D & H,

and B & M if the Commission should so direct, upon such equitable terms as the Commission might prescribe. We stated that if the three protected roads were ordered to be included in the N & W system, "such action would provide the solution to the problem of the necessary and indispensable protection to the three railroads that the Commission found prerequisite to the merger." 386 U. S., at 390.

In accordance with our remand of the Penn-Central merger case, the Commission conducted further proceedings in the N & W case on the pending petitions of the three roads. On June 9, 1967, it issued its decision to the effect that "inclusion of the petitioners in the N & W system is preferable to their inclusion in the Penn-Central," and ordered N & W to acquire the stock of the three roads on prescribed terms. *Norfolk & Western Railway Co. and New York, Chicago & St. Louis Railroad Co.—Merger, etc.*, 330 I. C. C. 780, 796 (1967). At the same time, in the remanded Penn-Central merger proceedings, the Commission reconsidered certain protective conditions it had previously devised to aid the three roads, imposed amended protective conditions to operate in the interim between consummation of the Penn-Central merger and the protected lines' inclusion in a major railroad system,[1] and again authorized the immediate consummation of the Penn-Central merger. *Pennsylvania Railroad Company—Merger—New York Central Railroad Company*, 330 I. C. C. 328 (1967).

On July 3, 1967, on application of parties opposing the Commission's merger order, the three-judge District Court for the Southern District of New York enjoined implementation of that order pending the decision of that court on review. Actions were also filed by sev-

---

[1] See *infra*, at 511–512.

eral parties in the same court to set aside the order of the Commission requiring the N & W to include the three protected roads in its system. Suits challenging both the merger and inclusion orders were instituted in other courts, but were stayed so as to permit orderly disposition of the basic issues in the Southern District of New York.[2] After expedited proceedings in that court, all complaints attacking the merger and the inclusion orders were dismissed[3] and the decisions of the Interstate Commerce Commission in both the merger and the inclusion proceedings were sustained. 279 F. Supp. 316. Various of the parties then sought relief in this Court. Because of the importance and urgency of the matter, we granted a further stay of the merger order, consolidated all proceedings that were before us relating to the merger and inclusion decisions, and expedited consideration thereof. See *post,* p. 946.

We have before us nine appeals, on behalf of 17 parties, from the decision of the District Court. Also docketed are two related petitions for mandamus or certiorari to the District Court for the Middle District of Pennsylvania, and one appeal from that court.

---

[2] See Memorandum Order of the District Court, issued July 3, 1967. Circuit Judge Friendly, for the District Court, noted that "litigation in six or more different district courts has seemingly been averted and all issues concentrated in a single court of first instance." We agree that this is commendable. If review of the inclusion decision and of the merger decision were in different courts, the difficulties presented by these cases would be multiplied.

[3] The Central Railroad of New Jersey (CNJ) asked and was granted a dispensation from the District Court's schedule for briefs and argument. The CNJ has reserved the right to assert that the Commission's order should contain certain protective conditions for it. It has waived the right to argue that the Penn-Central merger should be delayed. The complaint of the CNJ was not dismissed with the others and the Southern District of New York has yet to consider the position of this line.

The particular contentions urged upon us, in this multiplicity of proceedings, are many and varied. In general, however, the issues may be articulated as follows: Has the mandate of this Court been fulfilled, in that appropriate provision has now been made for the three smaller roads? Are the terms of the order providing for inclusion of the protected roads in the N & W system fair and equitable and in the public interest? Did the District Court err in refusing to enjoin consummation of the Penn-Central merger? Has adequate provision been made for resolution of the "peripheral" issues presented by the parties, which would not be foreclosed by a decision authorizing the consummation of the merger and inclusion of the protected roads in the N & W?

I. The Merger Decision.

A. IN GENERAL.

Most of the parties before us are in accord that the merger is in the public interest and should be consummated as promptly as possible. Those urging immediate consummation before this Court include the Department of Justice and the Commission, the States of Pennsylvania, Connecticut, Rhode Island, New York, Massachusetts, and New Jersey; the Railway Labor Executives' Association; the trustees of the NH; the Pennsylvania and New York Central railroads; B & M; and, in substance, the E–L, D & H, and N & W and its allies. While this consensus has reduced the attacks upon the merits of the merger to a minimum, considering the vast size and implications of the transaction, we must nevertheless address ourselves to the basic merits of the merger as well as to the specific objections that are before us.

With respect to the merits of the merger, however, our task is limited. We do not inquire whether the merger satisfies our own conception of the public in-

terest. Determination of the factors relevant to the public interest is entrusted by the law primarily to the Commission, subject to the standards of the governing statute. The judicial task is to determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence. See, e. g., *Illinois C. R. Co.* v. *Norfolk & W. R. Co.*, 385 U. S. 57, 69 (1966).

Section 5 of the Interstate Commerce Act, as amended by the Transportation Act of 1940, 54 Stat. 905, 49 U. S. C. § 5, sets forth the national transportation policy that is to guide the Commission in its scrutiny of mergers proposed by railroads. The Commission is to approve such proposals, pursuant to the terms of § 5 (2)(b) of that Act, when they are made upon just and reasonable terms and are "consistent with the public interest." In reaching its decision, the Commission is to give weight to a number of factors, such as: "(1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." 49 U. S. C. § 5 (2)(c).

We find no basis for reversing the decision of the District Court that the Commission's approval of the merger is in compliance with law and the statutory standards, and is based on adequate findings supported by substantial evidence. We shall first discuss considerations which are basic to the statutory standards, and we shall then turn to certain particular objections which have been made.

It is, of course, true that the policy of Congress, set forth in the Transportation Act, to consolidate the rail-

roads of this Nation into a "limited number of systems" is a variation from our traditional national policy, reflected in the antitrust laws, of insisting upon the primacy of competition as the touchstone of economic regulation. Competition is merely one consideration here. See *Seaboard Air Line R. Co.* v. *United States,* 382 U. S. 154 (1965). This departure from the general and familiar standard of industrial regulation emphasizes the need for insistence that, before a rail merger is approved, there must be convincing evidence that it will serve the national interest and that terms are prescribed so that the congressional objective of a rail system serving the public more effectively and efficiently will be carried out. Obviously, not every merger or consolidation that may be agreed upon by private interests can pass the statutory tests.

Examination of the record and of the findings in the present case, however, satisfies us that the Commission has properly and lawfully discharged its duties with respect to the merits of the merger. In these elaborate and lengthy proceedings the Commission has considered evidence tendered by others and compiled by its own staff. Upon the aggressive suit of parties representing conflicting interests, it has analyzed every pertinent aspect of the merger and the inclusion order. It has weighed conflicting viewpoints on all of the fundamental issues and many that are tangential. As the Commission concluded, the evidence before it, with negligible exceptions, attested to the probability of significant benefit from the merger, not only to the railroads and their investors, but also to shippers and the general public.

The Commission carefully considered the implications of the fact that the Pennsylvania and the New York Central, as individual systems, have operated at a profit, and that there are reasonably good prospects for a continuation of such operation. But it was impressed by the fact

that, as individual systems, these profits are not sufficient to put the roads in a position to make improvements important to the national interest, including the maintenance of services which, although essential to the public, are not self-supporting, and furnishing assistance to other roads serving public needs in their general territory. The Commission emphasized that the merger would enable the unified company to "accelerate investments in transportation property and continually modernize plant and equipment . . . and provide more and better service." 327 I. C. C. 475, 501–502. And it pointed out that only by permitting the merger would it be possible for the Commission to compel Penn-Central to come to the rescue of the New Haven, as we shall describe.

With respect to the lessening of competition where it now exists between the roads to be merged, the Commission pointed out that it will retain continuing power over reductions of service and facilities which are not specifically approved in the merger plans. Such consolidations and abandonments will have to be presented to the Commission for its approval and may be subjected to public criticism and hearings and to conditions or disapproval. It also noted that the rail service by the merged company will remain subject to vigorous competition from other roads, including the N & W and the C & O–B & O systems, and from motor, water, and air carriers. The Commission summarized some of the factors which would act as a restraint upon the merged company as follows:

"The power of shippers to direct the routing, the availability of numerous routes in a dense network of interline routes, the influence of connecting carriers in preventing a deterioration in service on the joint routes in which they participate, the growing strength of the N & W and C & O–B & O systems,

all stand to provide a check against any abuse of economic power by the merged applicants." 327 I. C. C., at 514.

Considering the record, and the findings and analysis of the Commission, we see no basis for reversal of the District Court's decision that the Commission's "public interest" conclusions are adequately supported and are in accordance with law. We find no basis, consonant with the principles governing judicial review, for setting aside the Commission's determination, approved by the District Court, that the "public interest" directives of the governing statute have been reasonably satisfied: that the transaction is likely to have a beneficial and not an adverse effect upon transportation service to the public; and that, as we shall discuss, appropriate provisions have been made with respect to other railroads that are directly affected by the merger.

### B. OBJECTIONS OF CERTAIN PENNSYLVANIA INTERESTS.

The only objectors in this Court to the public interest findings with respect to the merger are certain interests in the State of Pennsylvania. Appeal No. 835 was taken by the City of Scranton and Milton J. Shapp, a stockholder in the Pennsylvania Railroad Company. These parties filed complaints in the Southern District of New York challenging the Commission's original merger decision. After this Court's remand last Term, they were ordered by the District Court to file supplemental complaints. They declined to comply because, having intervened as plaintiffs in a proceeding challenging the merger in the Middle District of Pennsylvania, they chose to rely upon their asserted right to challenge the Commission's merger and inclusion decisions in the Pennsylvania action. After several warnings, their complaints in the New York court were dismissed, with prejudice.

The action in the Middle District of Pennsylvania, in which Shapp and Scranton intervened, was filed by the

Borough of Moosic on June 26, 1967, to set aside the Commission's orders, entered after our remand, approving the Penn-Central merger and the inclusion of the three protected roads in the N & W system. The Pennsylvania court stayed the Moosic proceeding by order of July 11, 1967, on the request of the United States and the Commission, for the sound purpose of preventing a multiplicity of litigation regarding the Commission's merger and inclusion decisions. Cf. *Kansas City Southern R. Co.* v. *United States*, 282 U. S. 760 (1931). Petitions for mandamus or certiorari, on behalf of Moosic (No. 663, Misc.) and Scranton and Shapp (No. 664, Misc.), seeking to challenge the stay of proceedings entered by the Pennsylvania court, have been filed in this Court. Since it now appears that the Middle District of Pennsylvania has dissolved its stay and commenced hearings, it would be pointless for us to review the stay order. Accordingly, the petitions for mandamus or certiorari are dismissed as moot.

Scranton, Shapp, and Moosic attack the Commission's merger and inclusion decisions along a broad front and claim error in the Commission's basic findings that the Penn-Central merger and inclusion of the protected lines in N & W are in the public interest. The thrust of this argument is that the Commission failed to consider or properly to evaluate the adverse effect of the Penn-Central merger, considered in light of the order requiring inclusion of the three protected roads in the N & W system, upon certain affected communities in the State of Pennsylvania. We do not agree. In its April 6, 1966, opinion approving the Penn-Central merger, the Commission examined the arguments made by participating communities in great detail and stated that the "contentions regarding the adverse effect of the merger on Pennsylvania's economy are not substantiated by the evidence. On this record, the prospects clearly import that the

merger will benefit rather than harm the Commonwealth."
327 I. C. C. 475, 492. At the time it made this finding,
the Commission was committed to the proposition enun-
ciated in the April 6, 1966, opinion, that the three pro-
tected roads would be included in one of the larger sys-
tems because of their inability to survive as independent
lines. This Court in its decision last Term emphasized
the importance of such inclusion. The Commission's con-
clusion that the net result of the merger would be bene-
ficial to the State of Pennsylvania is bolstered by the
strong position taken by the State in this Court that the
decision of the District Court for the Southern District
of New York should be affirmed.

As we discuss, *infra*, apart from the general and theo-
retical argument that the Penn-Central merger and the
inclusion of the three roads in the N & W system may
harm some Pennsylvania interests, complainants' fears of
specific injury resulting from reduction of competition
by specific curtailments of service now provided by the
three protected lines may be asserted in appropriate pro-
ceedings when such curtailment is specifically proposed.

All other complaints of these parties relate broadly
and generally to the fundamental and underlying eco-
nomic problems that are involved in the merger and in-
clusion decisions: for example, the anticompetitive con-
sequences of these decisions and the financial situation
and prospects of the Pennsylvania and New York Central
as independent lines. They were all the subject of exten-
sive evidence and were analyzed at length by the Com-
mission. In dismissing the complaints of Scranton and
Shapp for failure to go forward, Judge Friendly noted
that "[w]hile we entertain no doubt of the sufficiency of
this [procedural] ground, we think it well to add that . . .
we find no merit in the complaints of Shapp and The City
of Scranton." The court remarked that, for the most
part, "the attacks [of Scranton and Shapp] simply

represent disagreement with procedural and policy determinations which Congress has committed to the Commission." 279 F. Supp., at 326, n. 6. We find no reason to reverse the judgment of the District Court for the Southern District of New York for dismissing the complaints of Scranton and Shapp for failure to prosecute, or to set aside its conclusions as to the lack of merit of their claims, particularly in light of the limited function of judicial review of decisions such as those now before us and the opportunity open to them to challenge proposals which may be made for specific curtailment of service.

Scranton and Shapp, like the Borough of Moosic, wish now to go forward with their complaints in the Middle District of Pennsylvania, in which they seek an injunction against consummation of the Penn-Central merger and the effectiveness of the inclusion order. But Shapp and Scranton were parties to the New York proceedings and the Borough of Moosic had an adequate opportunity to join in the litigation in that court following the stay of proceedings in the Middle District of Pennsylvania. As we noted, *supra,* n. 2, all district courts in which actions to review the Commission's findings or for injunctive relief were filed continued their proceedings in deference to the New York court. All parties with standing to challenge the Commission's action might have joined in the New York proceedings.[4] In these circumstances, it necessarily follows that the decision of the New York court which, with certain exceptions,

---

[4] The process of the New York court ran throughout the Nation. 28 U. S. C. § 2321. In addition, the United States waived possible objections on venue grounds to appearances by any party in the New York litigation. In these circumstances, it would be senseless to permit parties seeking to challenge the merger and the inclusion orders to bring numerous suits in many different district courts. See, for the provision governing review of orders of administrative agencies in the courts of appeals, 28 U. S. C. § 2112.

we have affirmed, precludes further judicial review or adjudication of the issues upon which it passes. While it is therefore no longer open to the parties to challenge the Commission's approval of the Penn-Central merger and inclusion of the three protected lines in N & W, or its order that immediate consummation of the merger should be permitted, any claims for specific relief, such as particularized objections which may arise from specific proposals for consolidation or reduction of facilities or services, are unaffected by the decision in the present cases. Claims not precluded by the present decision may be pursued before the Commission or in the courts or both, as may be appropriate. This applies to Shapp, to the City of Scranton, and to the Borough of Moosic as well as to any other affected interests. The proceedings in the Middle District of Pennsylvania are not before us, except as we have dismissed as moot the petitions challenging that court's stay of its proceedings, and it will be the task of that court to determine the effect of the present decision upon the proceedings before it. Scranton, Shapp, and Moosic may, of course, seek such relief, if any, in that court as may be available and appropriate in light of our decision herein.

Finally, we must mention the City of Pottsville, which has appealed to this Court (No. 433). Pottsville's request to intervene in the Moosic action, upon a complaint similar to that of Moosic, was denied by the Middle District of Pennsylvania. Like Moosic, Pottsville had the opportunity—which it failed to seize—to litigate in the Southern District of New York. It appears that a principal basis for denial of Pottsville's request to intervene was the objection interposed by the United States and that this objection will, after our decision in the instant cases, be withdrawn. Upon this representation by the United States, without reference to or any attempt to consider the scope or content of the

action in which intervention is sought, or the issues, if any, which may remain for adjudication in that proceeding, we vacate the decision of the District Court for the Middle District of Pennsylvania denying intervention and remand Pottsville's case to that court for further consideration in light of our decision today.

C. OBJECTIONS OF THE NEW HAVEN'S BONDHOLDERS.

Two appeals, Nos. 830 and 831, have been taken on behalf of bondholders of the New York, New Haven and Hartford Railroad Company (NH). Since 1961 the NH has been in reorganization proceedings under § 77 of the Bankruptcy Act, 11 U. S. C. § 205. Despite the shelter of the bankruptcy court, it has been on the verge of financial collapse with the attendant risk to continuance of its rail service. The Commission has found that passenger as well as freight service by the NH is a national necessity and that termination of either would lead to distress in Connecticut, Massachusetts, and Rhode Island, and would severely damage New York City and the Nation generally. See *New York, New Haven & Hartford Railroad Co., Trustees, Discontinuance of All Interstate Passenger Trains,* 327 I. C. C. 151 (1966).

The NH competes in a relatively small part of its service area with the New York Central; but in the NH's financial condition, diversion of even a small amount of the Pennsylvania's connecting traffic from the NH to the Central would inflict consequential injury. Even without reference to the hazard of such diversion, inclusion of the NH in the Penn-Central combination is the only possibility that has been advanced by any of the parties—including the complaining bondholders—for continued operation of NH, short of the sheer speculation that the States concerned or the Federal Government might take over the road and its operations.

508

In June 1962, with permission of the bankruptcy court, the New Haven's trustees requested the ICC to make provision under § 5 (2)(d) of the Act for its inclusion in the proposed Penn-Central merger. When the Commission first considered the merger, it stated that "we will require all the New Haven railroad [both passenger and freight operations] to be included in the applicants' transaction"; and in its initial report it provided that "our approval of the merger is conditioned upon such inclusion." 327 I. C. C., at 524, 527. It required that the parties to the merger irrevocably stipulate that they would consent to inclusion upon such terms as might be agreed between the NH and the merger parties or, failing this agreement, upon such terms as the Commission might prescribe with the approval of the bankruptcy court. 327 I. C. C., at 553.

The trustees of the NH and the two companies conducted lengthy negotiations and finally arrived at an agreement as to inclusion terms dated April 21, 1966, amended October 4, 1966. In July 1967 the NH bankruptcy court warned that New Haven's cash depletion was "so serious that, if the present rate of loss continues, there will be insufficient left by late September to meet the payroll." Subsequent improvement of cash position permitted amendment of this dire prediction so that it was expected that operation could be financed to January 1968.

The Commission on August 3, 1967, directed the negotiation of a lease between the New Haven trustees and Penn and Central, to be "immediately available upon consummation of the Penn-Central merger." The parties, however, reported that preparation of a lease in time to meet the New Haven's needs was not possible. Thereupon, the Commission ordered a hearing as to whether a lease, loan, or other arrangement should be made to

assure the NH's continued operation until its acquisition by Penn-Central. On November 21, 1967, the Commission issued an order, subject to the approval of the bankruptcy court, providing (a) terms for the inclusion of the New Haven in the Penn-Central system upon effectuation of the Penn-Central merger; (b) for the Penn-Central to lend $25,000,000 to the New Haven over a three-year period in return for trustees' certificates; and (c) for the Penn-Central to bear 100% of the operating losses of the New Haven during the first year after the merger, 50% in the second, and 25% in the third, subject to a ceiling of $5,500,000 in each year on the total amount that Penn-Central could be required to absorb and subject to termination upon transfer of the New Haven assets. Acceptance of these terms by Penn and Central is a required condition of approval of their merger. The Commission has retained jurisdiction "for the purpose of making such further order or orders in these proceedings as may be necessary or appropriate."

The merits of these provisions are not before us. They have not been reviewed by the bankruptcy court or by a statutory district court under the applicable statute. The New Haven trustees and the States of Connecticut, Massachusetts, Rhode Island, and New York, as well as the United States, have filed briefs urging this Court to affirm approval of the Penn-Central merger, citing the urgent need for this in order to salvage the New Haven's operations. The attack, so far as the New Haven is involved, has been launched by Oscar Gruss & Son, a holder of approximately 14% of the NH's first and refunding mortgage bonds and by the Protective Committee for that issue, which intervened in Gruss' action below. (Nos. 830 and 831.) The claim is that because continued operation of the New Haven at a loss involves progressive erosion of the bondholders' security and

because the interim arrangement does not assure that Penn-Central will absorb all of the operating losses, we should not permit the Penn-Central merger to be consummated without simultaneous inclusion of the NH. In view of the probable difficulties in reaching agreement for inclusion of the NH which will satisfy its bondholders, it is virtually certain that this would mean lengthy delay during which the NH would not have access to the interim Penn-Central financial aid, and might be faced with collapse of its operations.

The Commission, after hearing the bondholders' contention, pointed out that "[i]t is a fundamental aspect of our free enterprise economy that private persons assume the risks attached to their investments, and the NH creditors can expect no less because the NH's properties are devoted to a public use. Indeed, the assistance the creditors are receiving from the States and would receive from Penn-Central through the sharing of operating losses would raise some of that burden from their shoulders." *Pennsylvania Railroad Company—Merger—New York Central Railroad Company,* 331 I. C. C. 643, 704 (1967). The District Court, putting aside questions of the standing of the NH bondholders to attack the Penn-Central merger, affirmed the Commission's rejection of the attack.

Continuation of the operations of the NH, which the Commission has found to be essential, can be assured only upon and after effectuation of the merger of the Penn-Central. The bondholders agree that to delay the Penn-Central merger until all proceedings necessary to include the NH have taken place may well mean the end of NH operations. The only realistic way to avoid this is to permit prompt consummation of the Penn-Central merger subject to appropriate conditions respecting the New Haven which Penn-Central will perforce accept by its act of merger. While the rights of

the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move.

While we reject the appeals of the NH bondholders, acceptance or rejection of the terms and conditions on behalf of the NH remains to be determined. The bondholders' objections may be registered and adjudicated in the bankruptcy court or upon judicial review as provided by law. Furthermore, as noted above, the Commission has retained jurisdiction to make further appropriate orders, if necessary, and has provided both that inclusion of the NH in Penn-Central and the making of the loan arrangement on such terms as are prescribed by the Commission, are conditions of approval of the merger.

We affirm the District Court's dismissal of the appeals in No. 830 and No. 831.

### D. OBJECTIONS BASED ON THE PROVISIONS MADE FOR THE PROTECTED ROADS.

The N & W and roads associated with its position (the Chesapeake & Ohio (C & O), Baltimore & Ohio (B & O), and Western Maryland) have filed an appeal (No. 778). In brief and upon argument they stated that they do not object to the Penn-Central merger itself. Their stated position is that they oppose "immediate consummation"—that is prior to the actual inclusion of E–L, D & H, and B & M in the N & W. They also assail the specific operation and effect of the protective conditions and urge modifications thereof, and attack the basic legality of the conditions as a revenue pool.

The assailed protective provisions appear as Appendix G to the Commission's order in the merger case. They

are essentially of two types: traffic conditions that require the merged Penn-Central not to change routes, rates, or service in such a way as to divert traffic from the protected lines; and revenue indemnity conditions establishing a formula whereby Penn-Central is to compensate the protected lines in the event of adverse revenue results following the merger.[5] At the time the case was before us last Term, the Commission had withdrawn the revenue indemnity conditions pending further consideration. After our remand, the Commission further considered all the conditions, amended them in some respects not here material, and restored the revenue indemnity conditions. None of the protected roads has lodged objections against these provisions, nor has Penn-Central, and we affirm the District Court's conclusion that they appear to provide adequate interim protection for the three roads in conformity with the purposes insisted upon by the Commission and which this Court sought to ensure by its decision last Term.[6]

---

[5] The formula is directed to compensation for an approximation of the revenues which may be lost by the protected lines to Penn-Central. Revenue ratios are determined by dividing the combined 1965 freight revenues of Penn and Central into the 1965 freight revenues of each of the protected lines. For any given subsequent year, the total freight revenue of the merged Penn-Central and of the protected line in question is then multiplied by that line's revenue ratio. The actual earned freight revenue of the protected line for the given year is then subtracted from the figure obtained by this multiplication. If the result is a positive figure, it is multiplied by an indemnification ratio of 50%, which yields the total amount of indemnity owed. The Commission has indicated that the indemnity conditions are to supplement the traffic conditions, not to replace them; Penn-Central is not given a choice of obeying the traffic conditions or paying liquidated damages, in the form of indemnity.

[6] E–L and D & H unsuccessfully sought from the Commission a provision for "capital loss indemnification" to be paid them by Penn-Central in the event that the price for their inclusion in N & W was reduced because of the effect of the Penn-Central merger on their

The objectors, however, attack the protective provisions on three grounds: First, they claim that the revenue indemnity provisions create a pooling agreement proscribed by § 5 (1) of the Interstate Commerce Act, 49 U. S. C. § 5 (1). Second, they say that the conditions give each of the protected lines an incentive to divert traffic to Penn-Central and vice versa. Such traffic diversion, they argue, would be at the expense of the objecting, "unprotected," lines. Third, they also assert that the shield which these provisions give the protected lines dilutes their incentive to join the N & W, permits them or some of them unfairly to "shop around" for better terms of inclusion, and may delay or abort their inclusion in the N & W.

We first address ourselves to the argument assailing the indemnity provisions as an illegal pool. As the District Court pointed out, the legislative history of § 5 (1) leads to the conclusion that the section was not intended to apply to cases such as this one, in which the putative revenue pool is not the creation of private parties but is imposed by the Commission itself as a condition to consummation of a merger. Additionally, even if we consider the section applicable in these circumstances, there is no merit to the contention that the protective conditions must be struck down. Section 5 (1) proscribes "any contract, agreement, or combination [among] . . . carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof," unless the Commission finds that such pooling or division "will be in the interest of better service to the public or of economy in operation, and will not unduly restrain com-

---

traffic. Although E–L and D & H have presented an appeal (No. 832) on this issue to this Court, the appeal is contingent on our reversal of the Commission's inclusion terms or our upsetting of the protective conditions. Because we today make neither of these decisions, the appeal of E–L and D & H is dismissed.

petition." The Commission has held that, even if the conditions it established were a pooling arrangement, "this record clearly supports findings . . . that to protect these carriers clearly is 'in the interest of better service to the public' " and " 'will not unduly restrain competition.' " 330 I. C. C. 328, 345, n. 8. We agree with the District Court that this finding is supported by substantial evidence in the record. The interim protection of the protected lines is, in the Commission's view and under the decision of this Court last Term, essential. These conditions have been adopted for that purpose and we see no reason on the present record to conclude that they are unlawful. In the event that actual experience reveals that the provisions operate inequitably, recourse may be had to the Commission for relief pursuant to its reserved jurisdiction, subject to judicial review.

With respect to the contention that, regardless of whether the indemnity provisions constitute a revenue pool, those provisions will induce the protected carriers and Penn-Central improperly to divert traffic to one another and thereby to injure the unprotected roads, the District Court correctly concluded that there is no basis for rejecting the Commission's findings that neither the protected roads nor Penn-Central "would have either the motive or the ability to engage in such diversion on any substantial scale." 279 F. Supp., at 328. This conclusion was reached largely because of the ability of the N & W to retaliate and the limitations imposed by economic conditions and geographic facts. The Commission included in its findings "a provision that would prohibit the protected carriers from engaging in manipulation, with sanctions if they do," 330 I. C. C., at 355, and it specifically reserved jurisdiction to reopen proceedings and modify the protective conditions "in the light of experience." The Commission has also included a gen-

eral reservation of jurisdiction, under which it could revise the protective conditions.[7] If, in light of experience, improper traffic diversions should develop or, as noted above, if these conditions should otherwise prove to be inequitable, recourse may be had to the Commission under these reservations, subject to judicial review as appropriate.[8]

N & W expresses the fear that the traffic and revenue indemnity provisions will be so attractive that the three lines or some of them will prefer to continue under their umbrella, and will not promptly accept the Commission's ticket of admission to the N & W system. The Commission's reserved power appears to be adequate to deter such conduct if and when it becomes abusive. Further, one of the protected lines, the largest of the three (E–L), already has accepted, by stockholder vote, its inclusion in N & W. The board of directors of

[7] In establishing the protective conditions, the Commission has ordered "[t]hat the jurisdiction of this Commission be, and it is hereby, retained for the purpose of making such further order or orders in these proceedings as may be necessary or appropriate, in addition to those orders under jurisdiction expressly retained in the prior reports and orders of the Commission and to those orders which may be issued under section 5 (9) of the Interstate Commerce Act." See n. 11, infra.

[8] The "protected period" during which the conditions are to be in effect will run from the date of consummation of the merger until the date of actual "inclusion of [the] protected carrier in a Railway System which includes Norfolk & Western Railway Company or any successor thereto, or in the Railway System to be operated by the merged company . . . ; provided, however, that if, as to any such protected carrier, no such inclusion shall have been effected within 1 year [of] the final determination of (i) the petitions which such protected carrier now has pending for inclusion in such Railway Systems, and (ii) any new or supplemental petition or petitions which such protected carrier may seasonably file for inclusion in any such Railway System then, as to that protected carrier, the protective period shall end when this Commission shall so order." 330 I. C. C., at 362.

another (D & H) has recommended to stockholders that inclusion be accepted.[9] In view of these circumstances, the fears expressed by N & W and the other protestants as to the dangers which perpetuation of these provisions will pose must be regarded as speculative. Clearly, if one or more of the protected roads should decline to accept the terms for inclusion specified by the Commission's order, the Commission could be called upon to examine, pursuant to its reserved power, the appropriate action to be taken to terminate or modify the interim protective provisions or otherwise to ensure that the shield supplied to the roads is not converted into a sword. The fears expressed by the protestors fall far short of furnishing a reason for rejecting the District Court's approval of the Commission's order that the Penn-Central merger be immediately consummated. Nor is there merit to N & W's contention that it was error for the Commission to fail to rule, now and forever, that the protected roads may not be included in Penn-Central. Whether or not such permission appears likely, there is no occasion for such contingent foreclosure.

Finally, we reject the contention that this Court's prior opinion in this matter now precludes us from permitting consummation of the merger until actual inclusion of the three roads in a larger system. With respect to the inclusion problem, our criticism of the original Commission order ran to the ICC's failure to decide the question over which it had undoubted jurisdiction and which

---

[9] N & W places emphasis on a letter written to stockholders by the President of D & H, who is a director and a large stockholder, to the effect that he is formulating an alternative proposal to inclusion in the N & W. But at oral argument counsel for D & H reiterated that road's desire that this Court affirm the inclusion order and the merger judgment, and there is no basis in the record before us for concluding that the D & H Board of Directors has changed its position.

the Commission itself had found to be important to the public interest: the determination, so far as the Commission was empowered, of the ultimate home of the three roads. As this Court said: "we can only conclude that it is necessary that the [Commission's] decision as to the future of the protected railroads and their inclusion in a major system be decided prior to consummation of the Penn-Central merger." 386 U. S., at 390. Our decision was not intended to require an indeterminate delay in the consummation of the merger, pending the resolution of the jockeying, negotiating, and fighting among all of the parties concerned and completion of the multitudinous procedures necessarily involved. This would place the public interest as well as the vast majority of the affected private interests at the mercy of decisions not merely of certain corporations whose interests are, in fact, secondary or derivative, but of classes of security holders. It was our intention that the public interest should be served with fairness to all private parties concerned, not that it should be the captive of parties some of whom are understandably engaged in maneuvering solely for the purpose of improving their competitive, strategic, or negotiating positions.

There is no provision of law by which the Commission or the courts may compel the three protected roads to accept inclusion in the N & W, as ordered by the Commission, or in any other system: Section 5 (2)(d) of the Act provides:

"The Commission shall have authority in the case of a proposed transaction under this paragraph involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads request-

ing such inclusion, and upon a finding that such inclusion is consistent with the public interest."

It does not make provision for compelling an unwilling railroad which is not itself a party to a merger agreement to accept inclusion under the terms the Commission prescribes. Our opinion on the first appeals commanded the Commission to specify the opportunity provided for the smaller roads to be included in a major system, before approving consummation of the Penn-Central merger. It was not intended to give the protected corporations or the creditors or stockholders of each of them, or the N & W relying on their position, a veto over the public interest which the Commission has found to inhere in this merger.

We need not pause to discuss in detail N & W's contention that the Commission's findings do not support a conclusion that N & W must proceed with inclusion of fewer than all three of the protected roads, if, for example, B & M does not accept the terms. The original decision in the N & W-Nickel Plate merger proceedings clearly contemplates action by the Commission upon a "petition or petitions" of one or more of the three roads. 324 I. C. C. 1, 148. Separate petitions were in fact filed by each of these roads. As the District Court concluded, in light of the favorable action already taken by E–L stockholders and the D & H Board of Directors, the possibility of noninclusion of B & M would not be cause for setting aside the Commission's order.[10]

---

[10] The remaining arguments by appellants in No. 778 may be briefly noted and answered. There is no substance to appellants' contention that the Commission failed to find that the consummation of the merger under the protective conditions would be in the public interest. As the District Court concluded, this finding is "implicit in the very concept of devising conditions permitting consummation prior to actual inclusion of the protected roads in a major system

### E. THE POSITION OF READING CO.

No. 834 is an appeal on behalf of the Reading railroad. Reading does not ask that the consummation of the merger be stayed. Its complaint is directed to the District Court's affirmance of the Commission's refusal to permit Reading to reopen the record and submit evidence in support of its claim that it should receive protective conditions similar to those the three "protected roads" were given in Appendix G to the merger order.

Reading is controlled by the C & O–B & O system through stock ownership. It has been suggested under the so-called Dereco plan, that the proposed N & W–C & O merger should include the Reading, as well as certain other small roads. Reading did not and does not ask for inclusion in Penn-Central, or for inclusion at this time in N & W along with E–L, D & H, and B & M. It did not offer evidence in the Penn-Central proceedings as to possible traffic diversion, until its tender made after the record had been closed. It now claims, however, that since much of its trackage is paralleled by lines of the Pennsylvania, it will be injured by the merger and should have the benefit of the Appendix G provisions.

Reading requests that we remand its case to the Commission for a decision as to whether protective conditions should be established for it. The Commission found, in its original report, that Reading would not be harmed

---

and was made explicit when the Commission said that only 'some of the merger benefits' would be prevented and that the conditions would not work 'an undue hardship upon applicants either in their operations or merger implementation.' 327 I. C. C., at 532; see also 330 I. C. C., at 361. To deny evidentiary basis for this finding would defy common sense." 279 F. Supp., at 329. And appellants' attack upon the District Court's opinion on the basis of *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947), totally misconceives the limited office of that decision. See n. 14, *infra*.

by the merger and that protective conditions were therefore unnecessary. This finding was based in part on a letter submitted by Reading itself to the Commonwealth of Pennsylvania and introduced, without objection from Reading, in evidence before the Commission. Only after the Commission issued its report did Reading object to the finding of no adverse impact upon it as a result of the merger, and then Reading's fear appears to have been chiefly that a finding of no adverse impact might prejudice its eventual attempt to join in the N & W–C & O merger. The Commission held Reading to its "original concession that the effect of the merger transaction (without the indemnity conditions) upon them would be inconsequential." 330 I. C. C. 328, 357. In response to Reading's specific concern, the Commission modified its finding of no adverse impact to a finding that no adverse impact had been shown. The District Court upheld this decision and, in addition, concluded that Reading's claim of substantial adverse impact as a result of the Penn-Central merger was unpersuasive on the merits.

Ordinarily, we would, without more, concur with the District Court's view. Because of the vastness and complexity of this matter, however, and in order to ensure that whatever substance there may be to Reading's claim is not sacrificed, we sustain the Commission's denial of Reading's submission on condition that it is without prejudice to any proceeding which Reading may hereafter institute, based on actual experience, for relief from undue prejudice caused by the merger.

## II. INCLUSION DECISION.

Three appeals, No. 779, No. 833, and No. 836, relate to the Commission's order, entered in the N & W-Nickel Plate merger proceedings, prescribing that N & W accept inclusion of the E–L, D & H, and B & M in the N & W system and specifying the terms thereof. *Norfolk &*

*Western Railway Co. and New York, Chicago & St. Louis Railroad Co.—Merger, etc.*, 324 I. C. C. 1 (1964), supplemented, 330 I. C. C. 780, reconsidered, 331 I. C. C. 22 (1967). In 1964 the Commission approved the N & W-Nickel Plate merger subject, among other conditions, to the Commission's retention of jurisdiction for five years to permit the filing of petitions by E–L, D & H, and B & M for inclusion in the N & W system. The Commission's approval was also subject to the condition that N & W give its irrevocable consent to inclusion of the three roads on terms that the ICC would itself prescribe in the absence of agreement among the affected parties. 324 I. C. C. 1, 148. The three lines in due course filed petitions for inclusion. Hearings were held, and, on June 9, 1967, following our remand in the Penn-Central merger case, the Commission made findings and entered its order requiring N & W to include the three roads in its system under terms it prescribed.

Appellants are the N & W, the B & M, and a number of E–L bondholders. As we shall discuss, only the N & W appeal raises issues which go broadly to the merits of the Commission's order implementing N & W's duty to accept inclusion of the three roads. B & M seeks remand on the grounds that the terms fixed by the Commission for N & W's offer to acquire the stock of the B & M are inadequate to reflect B & M's value as part of the N & W system. The third appeal, brought by E–L bondholders, turns on the question whether the Commission should have specifically retained jurisdiction to protect the E–L bondholders in the event that N & W attempts after inclusion improperly to divert E–L traffic to itself. We affirm the District Court's action in disallowing the claims of all of these appellants. Reference is made to preceding sections of this opinion for discussion of the bearing of claims respecting the inclusion order upon the Penn-Central proceeding.

We first address ourselves to the demands of E–L
bondholders for assurance that the reservation of juris-
diction by the Commission would enable them to obtain
consideration of unwarranted traffic diversion by N & W,
if that should develop. Since N & W will be acquir-
ing stock control of E–L and E–L's bondholders will look
to E–L's fortunes for payment and security, the bond-
holders fear that N & W may not be entirely solicitous
of E–L's welfare. Appellants themselves note that the
Commission, in adopting the report and order of the
officer presiding over the original hearing, has reserved
jurisdiction "to receive such petitions, institute such in-
vestigations, and make such orders to accomplish the ob-
jectives and purposes of the plan for inclusion and other
terms and conditions prescribed herein . . . ." The Com-
mission has also retained jurisdiction "for the purpose of
making such further order or orders in these proceedings
as may be necessary or appropriate, in addition to those
orders under jurisdiction expressly retained in the prior
reports and orders of the Commission and to those orders
which may be issued under section 5 (9) of the Interstate
Commerce Act." [11] Supplemental Order issued June 9,
1967. We have no doubt that if, after inclusion of E–L,
N & W should engage in a course of conduct which in-
vades the rights of E–L bondholders, the bondholders
may apply to the Commission for relief and the Commis-
sion's reservation of jurisdiction will enable it to rule
upon this complaint and to grant relief, if warranted,
subject to judicial review.

The other two appeals require somewhat more ex-
tended comment. We first note that our opinion at the

---

[11] Section 5 (9) provides that "the Commission may from time
to time, for good cause shown, make such orders, supplemental to
any order made (under its power to authorize railroad consolida-
tions) . . . as it may deem necessary or appropriate."

last Term found adequate support for the Commission's conclusion that the public interest requires inclusion of the three roads in a larger system. As we have previously noted, see *supra*, at 503–505, the Commission's findings and order with respect to the "public interest considerations" involved in the inclusion of these lines in the N & W system are in conformity with the statute and are supported by substantial evidence.

The attack of N & W and B & M upon the Commission's order centers, not upon the fundamental issues, but upon the particular terms of that order. In brief, the Commission has provided that N & W will purchase stock control of E–L and B & M through wholly owned subsidiaries. It has fixed the basis for such purchase in relation to the experienced income of the lines, their earnings having been adjusted for various factors including savings and gains which the Commission found would result from inclusion in the N & W system. The Commission has satisfied itself that traffic losses to the merged Penn-Central would be offset by benefits to N & W not otherwise taken into account. The shareholders of these roads are to receive stock of a newly created subsidiary of N & W, which will eventually be convertible into N & W common stock. In the case of D & H, the means of valuation was the same as for the other protected lines, but N & W is to pay for D & H assets either in cash or with a note and N & W stock.

This is the first time in the Commission's history that it has undertaken to "replace the bargaining session." It did so here pursuant to the N & W stipulation, which was accepted by N & W as a condition to the N & W-Nickel Plate merger, and in response to the exigencies of the situation emphasized by this Court's decision at our last Term.

As we have noted above, the E–L stockholders have voted approval of the inclusion terms. The D & H Board

of Directors has recommended approval to its stockholders. N & W complains that the price set for inclusion of the three lines is too high and that some other aspects of inclusion are arbitrary. B & M, on the other hand, complains that the price set for its inclusion is too low. The District Court affirmed the Commission's findings and conclusions, and in the exercise of our reviewing function we find no basis for reversing that court's decision.

The method for determining the value and exchange ratio which the Commission adopted, and which we have briefly described, is not attacked. It is a method that is reasonably conventional and generally accepted, always subject to the modifications and adaptations required by individual cases, and we see no basis for holding it erroneous as a matter of law. The attack that is launched is upon factors of particularized judgment and the weight to be ascribed to various values. These are matters as to which reasonable men may reasonably differ in detail, and we see no basis for setting aside the Commission's conclusions as sustained by the District Court. In setting inclusion terms, the Commission was dealing with complicated and elusive predictions about probable traffic patterns following the Penn-Central merger and the inclusion decision. We are no more competent than the Commission and the District Court to ascertain the accuracy of those predictions. We deem it our function, in the complexities of cases such as these, to review the judgment of the District Court with respect to agency actions to make certain that those actions are based upon substantial evidence and to guard against the possibility of gross error or unfairness. If we find those conclusions to be equitable and rational, it is not for us to second-guess each step in the Commission's process of deliberation.

N & W's attack upon the inclusion order centers upon its disagreement with the Commission's findings as to prospective earnings of the three roads as part of the N & W system. It argues that the Commission had no basis for concluding that the earnings of E–L, D & H, and B & M, as subsidiaries of N & W, would be adequate to assure their "viability."[12]  It asserts that the Commission has made various invalid adjustments of actual earnings and failed to make others.  This, N & W says, is "the principal area of dispute in these proceedings."

On the other hand, the B & M contends that the Commission's findings substantially underestimate the savings which should be credited to it as an earnings adjustment, and that, therefore, the terms for its inclusion are unjust.  Specifically, it urges that the Commission underestimated the probable amount of savings resulting from N & W control and the coordination of operations and equipment repair facilities and reduction of administrative expenses.  The Commission, however, accepted and relied on figures submitted by B & M's own witness.  B & M now assails these figures, but obviously the Commission was entitled to rely upon them.

The District Court examined in some detail the contentions of the parties attacking the financial terms of the inclusion order.  We have reviewed the findings of

[12] N & W contends that, for this reason, the Commission should have considered alternatives to inclusion as possible means of saving the service of the protected lines.  We believe N & W is considerably embarrassed, in making these arguments, by the fact that the Commission has contemplated inclusion of the protected lines in N & W ever since 1964, when N & W was permitted to consummate its highly successful merger with the Nickel Plate, and when N & W consented in principle to the inclusion of the three roads in N & W.  The protected lines were scarcely faring better in 1964 than they are now.  Despite the Commission's recognition that these lines are "weak," it has found their inclusion in N & W to be in the public interest.

the Commission in light of the evidence of record and the District Court's analysis, and we find no basis for reversing the District Court's judgment. The terms fixed by the Commission are clearly within the area of fairness and equity. Although B & M argues forcefully that the Commission underestimated the savings that should redound to its credit, we cannot say in the circumstances that the order should be reversed and remanded in this respect. It must be noted, as we have discussed in connection with appeals relating to the Penn-Central merger decision, that the inclusion order has no compulsive or coercive effect upon the roads to be included. Unless and until modified by the Commission, it remains available to the protected lines upon the terms which it specifies and which the District Court found to be fair and equitable.[13]

Only one other point of the N & W attack upon the inclusion order requires comment. N & W objects to the conditions prescribed by the Commission to protect the interests of the employees affected by the order. We note that those conditions, protecting employees of the protected lines, are the same as the conditions set by the Commission for N & W's employees at the time of the N & W-Nickel Plate merger. As the District Court held, "[t]he Commission acted within its powers in requiring N & W to protect employees of the three roads as thoroughly as those of the roads it was permitted to absorb only on the condition that it would accept these lines if the Commission so directed." 279 F. Supp., at 337.[14]

---

[13] There is no substance to N & W's argument that the Commission failed to consider the possibility that one or more of the protected lines would not join N & W. The Commission plainly did consider this possibility. It was not required to set a scale of terms for inclusion depending on the various hypothetical consequences of its order.

[14] We reject N & W's argument that the District Court was guilty of a violation of the rule of *SEC* v. *Chenery Corp.*, 332 U. S. 194

### III. CONCLUSION.

The judgment of the District Court for the Southern District of New York is affirmed, subject to the modifications and conditions stated in this opinion. Nos. 778, 779, 830–836 are remanded to that court for the entry of such orders and for such further action as may be consistent with our opinion and judgment herein and as may be appropriate with respect to the exercise of that court's jurisdiction in the premises.

The applications of Scranton, Shapp, and Moosic for mandamus or certiorari (Nos. 663, Misc. and 664, Misc.) are denied without prejudice to further proceedings in the District Court for the Middle District of Pennsylvania, consistent with this opinion.

In No. 433, jurisdiction is noted, the judgment of the Middle District of Pennsylvania with respect to Potts-

---

(1947). N & W attempts to extend the principle of that case far beyond its limits. But even if we were to accept N & W's construction of the case, N & W's conclusion would not follow. N & W relies on a statement by the District Court to the effect that "our discussion has revealed many ways by which, in our view, the Commission could support terms as favorable as it has established even if the Court should have held some of its subsidiary findings to be insufficient." 279 F. Supp., at 355. But that statement does not indicate that the court was basing its affirmance of the Commission on grounds other than those relied on by the Commission itself. On the contrary, the District Court appears to have agreed in substance with all the major findings of the Commission. To the Commission's analysis it added several points that it believed would *also* support the Commission's conclusions. The ultimate terms for inclusion were, of necessity, approximations based on the probable value of the protected lines to N & W. The District Court found that these values had been properly computed but that, even if they were not, N & W was protected by several adjustments that had been made by the Commission in order to ensure that inclusion was fair to N & W.

ville is vacated, and the cause is remanded to that court for further proceedings in light of our decision today.

Mr. Justice Marshall took no part in the consideration or decision of these cases.

Mr. Justice Douglas, dissenting in part in Nos. 433, 663, Misc., and 664, Misc.

In my opinion, these cases present important questions concerning the "public interest" which I feel the Commission should be required to answer before judicial review can be feasible.

The Pennsylvania District Court proceedings were initiated by the Borough of Moosic (petitioner in No. 663, Misc.), located in Lackawanna County, Pennsylvania. The Borough brought its action on June 26, 1967, to annul and set aside the orders of the Commission authorizing the Penn-Central merger and requiring the inclusion of E–L, D & H, and B & M in the N & W system.[1] Those orders by the Commission had been issued on June 9, 1967, following our remand last Term on March 27, 1967. *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S. 372. Moosic, whose complaint is dated June 26, 1967, was joined by intervenors City of Scranton and Milton J. Shapp (petitioners in No. 664, Misc.)[2] and

---

[1] The Borough of Moosic was a party to the *N & W Inclusion Case* before the Commission, in which it offered testimony and submitted exceptions. It was not, however, a party before the Commission in the *Penn-Central Merger Case,* reviewed by this Court last Term. Moosic, however, seeks to challenge the merger order in the Pennsylvania action. Since Moosic is served only by E–L and D & H, the Borough notes that it became concerned with the proposed Penn-Central merger only after it learned that the merger was in part responsible for the petitions of E–L and D & H for inclusion into N & W.

[2] The City of Scranton and Milton J. Shapp were parties to both proceedings before the Commission, and were intervenors in the

the City of Pottsville (appellant in No. 433).[3] On July 11, the court granted the applications of Shapp and the City of Scranton to intervene, but denied that of the City of Pottsville.

Before the Pennsylvania action was initiated, the District Court for the Southern District of New York, in which the original action to set aside the Commission's order allowing consummation of the Penn-Central merger had been filed (*i. e.*, the action reviewed by this Court

previous action commenced in the Southern District of New York, which was reviewed by this Court last Term. They were the only parties before the New York court last Term that challenged the basic validity of the Penn-Central merger. (See *Baltimore & Ohio R. Co.* v. *United States*, 386 U. S. 372, 462 (dissenting opinion of MR. JUSTICE FORTAS).) Their original complaint in the New York court was dismissed with prejudice by that court on October 19, 1967, pursuant to Rule 41 (b), Fed. Rules Civ. Proc., for failure to file a supplemental complaint attacking the Commission's order of June 9, 1967, in the *Penn-Central Merger Case*. Scranton and Shapp were never parties to the *N & W Inclusion Case* in the New York court.

Milton J. Shapp is a stockholder of the Pennsylvania Railroad Company, and a citizen of Pennsylvania. The City of Scranton is served by E–L, D & H and the Central Railroad of New Jersey. The city's interest stems both from the fact that the Penn-Central merger has necessitated the inclusion of E–L and D & H into N & W, thus making Scranton a two-railroad town, and from its fears that the proposed N & W–C & O merger will be approved along with the inclusion of CNJ therein, which would reduce Scranton to a one-railroad town. Since Scranton is a part of the Scranton-Wilkes Barre industrial and distribution complex of northeastern Pennsylvania, it also has an interest in the other railroads serving that economic area—the Reading Company, Lehigh Valley, and the Pennsylvania Railroad, together with their switching lines. The city and its surrounding area constitute one of the most important centers of railroad activity in the Eastern District.

[3] City of Pottsville was a party to the Commission proceedings involving the Penn-Central merger. The city is a municipal corporation located in Schuylkill County, Pennsylvania, and is served by the Reading Company and the Pennsylvania Railroad Company.

530

last Term), was asked to enjoin consummation of the merger authorized by the Commission's June 9 order until the validity of the inclusion order had been finally determined. On July 3 the New York court temporarily enjoined the merger, and ordered all plaintiffs and intervening plaintiffs in the original action to file supplemental complaints by July 17, attacking the June 9, 1967, order of the Commission in the *Penn-Central Merger Case,* or their complaints would be dismissed with prejudice.

Also before the Pennsylvania action was filed, N & W (on June 13) filed an action in a federal district court in Virginia to set aside the inclusion order; and on June 23, D & H filed a similar action in the Southern District of New York. Other interested parties had apparently indicated that they were contemplating filing additional actions in still other district courts, and the Government and the Commission urged all parties to present their challenges to the original District Court in New York. In a hearing before that court on June 28, two days after the filing of Moosic's complaint in Pennsylvania, it was stated that no objections to venue would be interposed by the Government against any party choosing to litigate in the New York forum. Thereafter, the United States and the Commission moved in the Virginia and Pennsylvania courts to stay proceedings pending the final determination of the New York actions. The Virginia court continued its proceedings until after the decision of the New York court should become available to it. The Pennsylvania court issued a stay until October 1, 1967.

Upon failing twice to have the stay order dissolved by the Pennsylvania court, the Borough of Moosic and Shapp and the City of Scranton petitioned this Court to vacate the stay order and command the District Court

to proceed with their complaints. The Court today dismisses those two petitions.[4]

The three communities involved—the Borough of Moosic and the cities of Scranton and Pottsville, make a broadside attack on many aspects of the merger in their actions in the Pennsylvania court. Among those many issues tendered is at least one that has never been considered by any court, namely, whether the inclusion of E–L, D & H, and B & M into N & W would have such a serious detrimental impact on their communities—in terms of services, employment, and business—as to make their inclusion against the "public interest" within the meaning of the Interstate Commerce Act. The communities also contend that they have not been afforded an adequate opportunity to present their arguments to the Commission.

This Court quotes the conclusion of the Commission that the "contentions regarding the adverse effect of the merger on Pennsylvania's economy are not substantiated by the evidence. On this record, the prospects clearly import that the merger will benefit rather than harm the Commonwealth." This statement, however, is taken from an earlier (April 6, 1966) opinion by

---

[4] Pottsville (No. 433) seeks review of the order of the Pennsylvania court denying its application for intervention in the *Moosic* case on the ground that the city was not located in the Middle District of Pennsylvania and "the defendant has objected to parties raising their objections to these I. C. C. Orders other than in the Southern District of New York . . . ." The Government, however, has no objection to the intervention of Pottsville below, and concedes that the court was in error in assuming that the Government's desire to have all actions challenging the Commission's orders brought in the New York court constituted an objection to Pottsville's formally becoming a party in the *Moosic* case. I therefore concur with the Court and agree to vacate the order denying Pottsville's application for leave to intervene and to remand to the District Court where Pottsville may renew its application.

the Commission in the merger case. *Pennsylvania Railroad Co.—Merger—New York Central Railroad Co.,* Finance Docket No. 21989, 327 I. C. C. 475, 492. In other words, the Commission was there directing its attention to the effects which the merger of the Penn and Central railroads itself would have on various Pennsylvania communities. It was not concerned with the community impact of the *inclusion of E–L, D & H, and B & M into the N & W system.* That issue was not then even before the Commission, but was presented only at a later date in the separately docketed *N & W Inclusion* case, in which the Commission issued its order on June 9, 1967. *Norfolk & Western Railway Co. and New York, Chicago & St. Louis Railroad Co.—Merger, etc.,* Finance Docket No. 21510, 330 I. C. C. 780.

The Court seems to suggest that because the Commission in its April 6, 1966, order also contemplated that E–L, D & H, and B & M would eventually be included in some major system, it must have been taking into account the impact of such inclusion on the communities served by those roads when it made the statement quoted above. But this assumption flies in the face of the Commission's case-by-case approach. It ignores the fact that the evidence before the Commission in Finance Docket No. 21989 (the *Penn-Central Merger Case*) relating to the community impact of the Penn-Central merger was not addressed to the impact which the eventual inclusion of E–L, D & H, and B & M into N & W would have on communities served by those roads. See Recommended Report, Finance Docket No. 21989, at 229–286; 327 I. C. C. 475, 489–493. And if the Court were correct in divining the Commission's hidden intent, I would have no doubt that the Commission did not provide adequate opportunity to the communities which would be affected by the inclusion of the three roads in any major system to participate in the proceedings. *Infra,* at 535–536.

Congress has, of course, committed all questions of policy under § 5 to the Commission; but on judicial review, we must be able to say that the Commission has made the necessary findings in determining policy— in this instance, that the inclusion will be in the "public interest." I do not find in the opinion of the District Court, or in the Court's opinion, a searching inquiry into the Commission's conclusions regarding the community impact of its orders in the *Inclusion Case* to ascertain whether they are adequately supported by "basic or essential findings." *Florida* v. *United States,* 282 U. S. 194, 215; *United States* v. *Carolina Carriers Corp.,* 315 U. S. 475, 489. A few words about the community impact of this case—the *Inclusion Case*—will point up what I mean.

In the Recommended Report of Commissioner Webb, served on December 22, 1966, in the *Inclusion Case,* scant attention was paid to the issues tendered by the community interests. Commissioner Webb noted that many representatives of various shipper and community interests testified concerning the vital need for the services of the three roads. He then disposed of the assertions of Milton J. Shapp and certain Pennsylvania interests in one sentence:

"Contrary to the assertions of Shapp and other Pennsylvania interests, intramodal competition would not be significantly lessened."

An accompanying footnote reads:

"Shapp's contentions that competition would be substantially curtailed and that rail facilities in the eastern and western portions of Pennsylvania would be contracted are predicated on the merger of both E–L and D & H into N & W. However, the merger of E–L into N & W is not authorized herein [only control was authorized]. Moosic submitted testi-

534

mony through its Mayor and Northampton through the Chairman of its Board of Commissioners, in which opinions were expressed that inclusion of E–L and D & H in the N & W system would be injurious to shippers and receivers and the economies of their areas. No evidence was offered to support these opinions and they are not sustained by any other evidence in the record."

This cursory treatment of the allegations of Shapp and other Pennsylvania interests is not an analysis of the merits of their assertions sufficient for judicial review. This is hardly a considered treatment of the effects which inclusion would have on communities presently served by more than one of the roads to be included in the N & W system.[5]

The parties in the Pennsylvania court argue that the Hearing Examiner and Commission failed to relate the various pieces of evidence which were available concerning the community impact of any reduction in services or facilities likely to result from the inclusion order in the communities involved. In particular, the parties note that Moosic would be a prime candidate for the pruning of facilities since it has a substantial amount of E–L and D & H track, and that Scranton would be reduced to a two-railroad town with E–L and D & H also having duplicating facilities in the area. It was noted that even though the Commission stated that its inclusion order did not authorize the abandonment of facilities, the evidence introduced by E–L in support of inclusion demonstrated clearly that the avowed purpose underlying the entire transaction was substantially to reduce facilities in the Wilkes Barre-Scranton-Bingham-

[5] This brusque treatment of the community allegations contrasts sharply with the lengthy discussion of certain community interest aspects of the Penn-Central merger found in the Recommended Report in Finance Docket No. 21989, at 229–286.

ton area, and thereby effect economies. It was further alleged that according to E–L's own plan presented to the Commission, inclusion of E–L and D & H into N & W would lead to the tearing up of the main line double track between Binghamton and Scranton, and would thus take Scranton off the main line between Chicago and New York.

The communities also contend that their opportunity to participate meaningfully in the *Inclusion* proceedings was seriously limited: the Commission and its Hearing Examiner denied all requests by Moosic to hold hearings in the Scranton area so that its citizens, businessmen, and civic leaders could be heard concerning the railroad proposals. And the City of Scranton describes the difficulty of meaningful participation by community interests in the following manner:

"The April 6, 1966 report of the Commission in the *PRR–NYC Merger Case* stated that its decision is related to the 'inclusion' proceeding, F. D. 21510, whereby E–L, D & H and B & M seek to be absorbed by N & W. The Commission stated that it took official notice of F. D. 21510 *and that it had a bearing on its decision.* [327 I. C. C. 475, 487–489.] Yet the fact was that the Commission, on April 6, 1966, did not and could not have considered the evidence of the nonrailroad parties to F. D. 21510, because such evidence from the nonrailroad parties was not circulated until April 13, 1966, and was not received in evidence prior to June 16, 1966. The Commission could not in its April 6, 1966 report have considered the public interest aspects of the inclusion case, but could only have based its PRR–NYC decision in this regard strictly upon consideration of railroad evidence, railroad positions, and railroad arguments."

It is not at all clear to me that the Commission offered a meaningful opportunity in the *Inclusion Case* to local and regional interests to present their arguments. That is a matter for the Pennsylvania court to determine in this *Inclusion Case*.

As respects the question of "public interest" in the *N & W Inclusion Case*, the Commission concluded:

> "On the positive side, inclusion of the petitioners in N & W will strengthen railroad competition, enhance the adequacy of the transportation service provided by N & W as well as the three petitioners by opening new routes and instituting new service, produce the economies and efficiencies inherent in single-line operation, and permit the joint use where possible, of facilities, equipment and routes. . . .
>
> "Our order herein does not authorize the abandonment of lines, operations or facilities by N & W or the petitioners. Applications for such abandonments are to be filed in appropriate proceedings. We expect N & W to maintain proper divisions with the petitioners." 330 I. C. C. 780, 827.

Despite the Commission's disclaimer that the inclusion order "does not authorize the abandonment of lines, operations or facilities," it appears that some abandonment will almost certainly result given the geographical location of the lines of the four roads involved and the companies' desire for efficiency. In addition, the Commission itself, in the first paragraph quoted above, indicates that it contemplates "economies and efficiencies inherent in single-line operation," and "the joint use where possible, of facilities, equipment and routes"—all of which portend significant effects on the local communities stretched along the routes of the roads. Deferral of the question of community interests until a subsequent hearing on abandonments will not ensure

adequate protection of those interests; for at the subsequent hearing the Penn-Central merger would be a fact, and the pressures would be great for increased economies on the part of the N & W system to make it a more efficient competitor of Penn-Central.

Communities which depend heavily on the railroad industry for employment, such as the City of Scranton, would be affected significantly by any loss of jobs. In its opinion in the *N & W Inclusion Case,* the Commission noted that in the earlier phase of this proceeding, N & W had entered into agreements with certain labor unions which provided that elimination of jobs resulting from the N & W-Nickel Plate unification would be accomplished only through normal attrition (*i. e.,* "principally by death, retirement, discharge for cause, or resignation." 330 I. C. C. 780, 822, n. 26); the agreements were apparently modified at a later date to prohibit transfer of employees to other jobs beyond their general locality. For those employees not covered by the agreements, the Commission imposed certain protective conditions prescribed in *Southern Ry. Co.—Control—Central of Georgia Ry. Co.,* 317 I. C. C. 557, as supplemented and clarified in 317 I. C. C. 729 and 320 I. C. C. 377. The Commission concluded that the employees of E–L, D & H, and B & M should be protected in the same manner as their counterparts involved in the N & W-Nickel Plate proceedings. For all employees not covered by attrition agreements, the protection would consist of the following: either N & W's existing agreements had to be modified to cover employees of the included roads or similar new agreements were to be drafted; and, if no agreement was concluded within 60 days, the Commission would impose appropriate conditions. The Commission denied the requests of D & H and B & M to extend this employee protection to their supervisory, professional, and executive personnel.

Whether the use of attrition agreements to eliminate jobs has a substantial adverse impact simply because jobs are eliminated is a question not free of doubt.

The Commission outlined the importance of the service of the three protected roads to the public, but limited this to a showing that, as a geographical matter, the lines of all three roads supplied needed services. 330 I. C. C. 780, 793–794. As far as appears from its decision, the Commission did not consider the unfavorable impact on the communities now served by more than one of the protected roads when the three roads are put into a single system.

Under a heading in its opinion entitled "Advantages to petitioners and to the public," the Commission noted that, under N & W control, the three protected roads could achieve substantial savings; and it observed further that:

> "The petitioners as well as the public will benefit from the unified management of what is now several separate companies operating independently. Among others, such benefits will include joint routes of affiliated lines, the prospect of single-line service, elimination of interchanges, improved schedules, and a more flexible distribution of equipment. Such benefits will increase the petitioners' ability to preserve and improve their present services and meet the needs of the shipping public. Through expanded piggyback operations, petitioners will be in a better position to meet the competition of motor carriers. Because many industries prefer to locate plants where a single-line through-route service will be available, more opportunities for industrial development will be created. As part of the large N & W system, the use of more modern equipment and facilities will be justified, resulting in greater efficiency, improved operations and better service to the public." 330 I. C. C. 780, 795.

These general conclusions are not addressed to the objections made by the communities affected. Moreover, the Commission's references to "joint routes," "elimination of interchanges," and a "more flexible distribution of equipment," suggest that community fears of eventual abandonment or scaling down of facilities are well founded.

The issues tendered by the parties in the Pennsylvania court, touching on the questions just described, are substantial and are not now before this Court for review. They have not been briefed or argued; and I fail to understand how the Court can presume to decide them.

The Court suggests that the community interests involved can obtain adequate protection from possible curtailment of service by asserting their challenges "in appropriate proceedings when such curtailment is specifically proposed." Yet it seems clear that postponing review of this question until a subsequent proceeding on proposed abandonments will not protect the communities adequately. The inclusion of the three protected roads into the N & W system surely portends significant curtailment and rerouting of the facilities of one or more of the four roads involved. Once the Penn-Central merger is consummated, N & W and its three included roads will face competitive injury unless their operations are streamlined and economized. The interests of the communities stretched along the routes of E–L, D & H, B & M, and N & W might well weigh less against the threat of Penn-Central competition once the merger has been consummated than those interests would if they were considered and evaluated before actual competition from a merged Penn-Central system is felt.

I do not suggest that we can now decide whether the impact on community interests justifies disapproval by the Commission of the inclusion of the three protected roads into N & W. The question of the adequacy of the Com-

540

mission's findings on this point has not been presented either to this Court or to the New York District Court; and as pointed out previously, I have grave doubts that the Commission's opinion in the *Inclusion Case* contains adequate findings on the issue to permit responsible judicial review.

The cases presently pending in Pennsylvania present, *inter alia,* the question whether the Commission failed to evaluate the adverse impact of the inclusion of the E–L, D & H, and B & M into the N & W system upon the communities served by the carriers involved.

In the action before the New York District Court, here for review in Nos. 778 and 779, that court dismissed the complaints of Shapp and the City of Scranton, with prejudice, for failing to file supplemental complaints attacking the Commission's June 9, 1967, order in the *Penn-Central Merger Case.* But the complaints of Shapp and Scranton that were dismissed with prejudice dealt only with the merits of the Commission's approval of the Penn-Central merger in its April 1966 decision in Finance Docket No. 21989. They did not attack the Commission's later (June 9, 1967) order in the separately docketed *Inclusion* proceedings. Thus, there is no question of *res judicata* present with regard to those parts of Shapp's and Scranton's complaints in the Pennsylvania court which attack the Commission's June 9 order in the *Inclusion Case.* And, of course, no question of *res judicata* arises with respect to the complaints of Moosic and Pottsville. Even if the *Penn-Central Merger* and *N & W Inclusion Cases* are regarded as inseparable, it is clear that the community impact aspect of the *Inclusion Case* was not considered by the New York court. It is evident from the record and that court's opinion that the primary concern of the court related to various aspects of the merger and inclusion orders tendered by the railroad parties which were unrelated to at least some of the

attacks leveled by the parties in the Middle District of Pennsylvania, including the question of community impact.[6]

The Court seemingly declares, however, a new rule of *res judicata* in its effort to prevent the parties in Pennsylvania from proceeding with their actions challenging the basic validity of the Commission's inclusion order on the ground, *inter alia,* that the Commission has not made adequate findings on the issue of the community impact of that order. Because the Borough of Moosic,

---

[6] With respect to the *N & W Inclusion* action, the court below noted that only "two points come even close to the larger public interest in the transaction . . . ." Those points were: first, N & W's complaint that the Commission should have considered the desirability of including the three protected roads along with the Reading Co. and the Central of New Jersey as wholly owned subsidiaries, not in the N & W system, but in the proposed N & W-B & O-C & O system; and second, N & W's assertion that the Commission erred in failing to find that inclusion of any of the three protected roads in the Penn-Central system rather than the N & W system would not be in the public interest. N & W has pursued the latter argument in this Court, asserting that by failing to make the suggested finding the Commission has left open the possibility that one or more of the three protected roads can eventually obtain inclusion in the merged Penn-Central system if inclusion in the N & W system is not voted by shareholders. The court rejected both of these contentions, holding that the Commission was not required to inject the N & W-B & O-C & O proposal into the instant proceeding or to make the negative finding requested by N & W to preclude the possibility of eventual inclusion of one or more of the three roads in the Penn-Central system. The court directed the remainder of its opinion dealing with the *N & W Inclusion Case* to examining the financial terms of the inclusion order, the employee protective conditions imposed by the Commission, the Commission's general standard for, and method of, valuation, certain attacks by E–L, D & H and B & M on matters of valuation peculiar to each road, and the possibility of non-inclusion of D & H and/or B & M in the N & W system—none of which involved the community impact problem. *Erie-Lackawanna R. Co.* v. *United States*, 279 F. Supp., at 336–352 (D. C. S. D. N. Y. 1967).

which had properly filed a suit in the Middle District of Pennsylvania but saw its action stayed, refused to accept the invitation of the New York District Court (a court in which Moosic was never a party, and which neither assumed jurisdiction over Moosic nor attempted to do so by making it an involuntary plaintiff) to come to New York and litigate, the Court holds that Moosic is bound by the decision of the New York court in the *Inclusion Case*. The New York court itself did not attempt to hold that its orders in the *Inclusion Case* would bind Moosic if it did not join in the New York proceedings. And I am at a loss to discover any such principle in the law of *res judicata*.

A party is entitled to its day in court; [7] and I cannot fathom how a party can be deprived of that right or waive it by refusing an invitation—not even an order—to litigate in another court located in another State.[8] The Court could reach its conclusion under the doctrine of *res judicata* only if Moosic could be termed in "privity" with one of the parties litigating in the New York action. See, *e. g., Lawlor* v. *National Screen Service Corp.*, 349 U. S. 322; *Bank of Kentucky* v. *Kentucky*, 207 U. S. 258; *Mutual Benefit Life Ins. Co.* v. *Tisdale*, 91 U. S. 238; *In re Howard*, 9 Wall. 175. But Scranton and Shapp were the only community interests in the New York court who challenged the Commission's basic finding that the Penn-Central merger was in the public interest;

---

[7] *Hansberry* v. *Lee*, 311 U. S. 32.

[8] Moosic states in its petition (No. 663, Misc.) that it did not wish to litigate in New York because that court had decided to treat the *Penn-Central Merger Case* and the *N & W Inclusion Case* as "separate proceedings for judicial review purposes," and such an approach would prejudice Moosic "since the adverse impact of *N & W Inclusion* must be considered as an integral part of any judicial review of *PRR–NYC*, and vice versa." Moosic also notes that "the community public interest issues inherent in [its] case . . . are clearly outside the scope of the litigation in the other forums."

and, as pointed out, their allegations were not directed to the Commission's order in the *N & W Inclusion Case*. The Borough of Moosic is a separate community, with distinct interests based on the facilities and lines of the various roads located within the Borough, or serving the Borough. Under such conditions, Moosic cannot properly be called in privity with Scranton or Shapp.[9]

The Court states that "further judicial review or adjudication of the issues upon which [the New York District Court] passes" is precluded by its decision. But,

---

[9] In *Hansberry* v. *Lee*, 311 U. S. 32, 43, we stated that even "when the only circumstance defining the class is that the determination of the rights of its members turns upon a single issue of fact or law," it might be possible for a State constitutionally to adopt a procedure whereby the judgment could be made binding on all members of the class; but only if "the procedure were so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue." This Court in the instant case makes no inquiry, however, whether Moosic can be termed a member of the "same class" as one or more of the parties in the New York court; or whether the issues are "common," and if they are, whether the proceedings have been conducted to ensure their "full and fair consideration."

The Court does not appear to argue that the action in the New York court was a "class action" within Rule 23, Fed. Rules Civ. Proc. Indeed, the court below did not treat it as such, nor make the findings (Rule 23 (a) and (b)) or give the type of notice (Rule 23 (c)) required by that Rule for class actions.

I can find no authority for a rule which would require a party not under the jurisdiction of the inviting court to respond affirmatively to an invitation to intervene or else be bound by an adverse decision. Indeed, *Chase National Bank* v. *Norwalk*, 291 U. S. 431, would suggest that the rule is to the contrary. The Court stated in that case that "[t]he law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger. . . . Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights." *Id.*, at 441.

as I have already pointed out, the New York court did not pass on at least some of the contentions, including the question of the community impact of the inclusion order, which are raised by the parties in Pennsylvania; nor were those questions even presented to the New York Court for review.

Congress might, of course, channel all complaints against an administrative agency order to a particular court. It has indeed done so in many instances through provisions that a person aggrieved by a certain type of order should seek review in a designated court of appeals. 28 U. S. C. § 2341 *et seq.* (1964 ed., Supp. II). Where review of an agency order is lodged in a court of appeals and review of the same agency order is also sought in other such courts, the court of appeals where review was first sought is the one to which all other courts are directed to transfer all proceedings with respect to the agency order. 28 U. S. C. § 2112 (a) (1964 ed., Supp. II). That has the obvious advantage of centralizing and consolidating judicial review and avoiding conflicts which might obtain if the parties could go to any court that had venue. Congress, however, has made no such provision respecting ICC orders. Section 2112, on which the Court relies, provides in subsection (d) that its provisions are not applicable to review of agency orders in the district courts. ICC orders are reviewable by three-judge district courts. 28 U. S. C. § 1336 (a), § 2325. The general provision for transfer of actions from one district court to another is 28 U. S. C. § 1404 (a). But 28 U. S. C. § 1398 provides, with exceptions not relevant here, that actions challenging ICC orders "shall be brought only in the judicial district wherein is the residence or principal office of any of the parties bringing such action." And where the jurisdiction of more than one three-judge district court has been invoked and a motion to transfer the proceedings from one to another has been made, the mo-

tion is denied if venue would not have been proper for an original action in the district court to which transfer is sought.[10] When a three-judge district court in New York was asked to transfer proceedings challenging an ICC order to the district court in Maryland, where another like challenge was being made, it declined, saying, "None of the plaintiffs in the actions in the Southern District of New York has its residence or principal office in the District of Maryland." *New York Central R. Co. v. United States,* 200 F. Supp. 944, 947 (D. C. S. D. N. Y. 1961). The New York District Court, speaking through Judge Friendly, refused to invoke the procedure provided for in 28 U. S. C. § 2112 (a), since that section applies, as already noted, only to review of agency orders in the courts of appeal. *Id.,* at 949–950. That court was much more faithful to the system of review, which Congress has provided, than we are today. Moosic and Scranton by no stretch of the imagination have their "residence" in New York. By 28 U. S. C. § 1398 venue plainly lies in Pennsylvania; and Congress has provided no method of transferring those suits to New York.[11]

---

[10] Our decisions in *Hoffman* v. *Blaski,* 363 U. S. 335, and *Van Dusen* v. *Barrack,* 376 U. S. 612, indicate that § 1404 (a) permits transfer only to a district court in which the plaintiff would have been entitled, without regard to consent by the defendant, to bring his action originally. Moosic and Scranton could not have brought an original action in New York.

[11] If statutory provisions provide that a person aggrieved must litigate his contentions in a specific federal court, fair notice has been given that if he does not appear and present his claims in the designated court, he will forfeit his right to be heard. But when there is no such statutory provision and when indeed the applicable statute provides for review in the Pennsylvania District Court, the place of residence, is *due process* satisfied when an aggrieved person, who was never a party in the New York court or in privity with any party there, is deprived of a right to be heard on an issue not litigated in that court, simply because he was invited to participate

546

It is not only hard cases which make bad law. Cases surcharged with the pressure for instant and immediate decision do the same [12] and create precedents which plague us.

It seems clear to me that we must permit the parties to litigate in the Pennsylvania court *whether E–L, D & H and B & M should be included in the N & W system.* By no stretch of the imagination can it be argued that the question of the adverse impact on the Pennsylvania communities of the inclusion of the three roads in the N & W system, as now posed by the parties in Pennsylvania, was here for review or was before the New York District Court. See *Erie-Lackawanna R. Co.* v. *United States,* 279 F. Supp., at 325–326.

Last Term we held that the ultimate fate of the three protected roads must be determined before the Penn-Central merger could be consummated. This surely means that judicial review must first be had at least

and the United States waived objections? That, I submit, is not a wholly frivolous question.

Nationwide service of process was available to the New York court. 28 U. S. C. § 2321. The United States and the ICC had waived all objections to venue against any party seeking to litigate in New York. But although the United States and the Commission moved successfully in the New York court under Rule 19, Fed. Rules Civ. Proc., to join N & W as an involuntary plaintiff in D & H's action challenging the inclusion order, they made no effort to join Moosic pursuant to that Rule.

[12] "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." Holmes, J., dissenting, in *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401.

with respect to the contentions which bear on *the basic validity of the inclusion order*—that is, whether the order is in the "public interest," as required by 49 U. S. C. § 5 (2)(d)—as distinguished from collateral questions about the order which need not delay the Penn-Central merger. The basic validity of the inclusion order certainly involves the impact of the inclusion on the communities served by the three lines in question. Whether other questions of like character have survived need not now be determined. It is certain that at least the community-impact issue has not been resolved. And its intimate connection with our holding last Term is evident. For what if it were found that by reason of the impact on the communities the inclusion order was not in the public interest? Our "protected" roads would then have no home.

The stay order of the Pennsylvania court has expired, and that court is now proceeding with these cases. For purposes of review by this Court, the petitions in Nos. 663, Misc. and 664, Misc., seeking review of the stay order or mandamus to compel the Pennsylvania court to proceed with the cases, can be dismissed. But those petitions did not present to this Court any question concerning the merits of the parties' actions in Pennsylvania; rather they attacked the validity of the order staying their actions in deference to proceedings then being conducted in the New York District Court. And, as already pointed out, at least the question of the community impact of the inclusion order, which is raised in Pennsylvania, has not been .presented either to this Court or the New York District Court for review. I therefore dissent from the Court's holding that all of the parties now litigating in Pennsylvania are precluded from challenging "the Commission's basic findings that the . . . inclusion of the protected lines in N & W [is] in the public interest." If the Pennsylvania court believes

that the allegations of the plaintiffs are substantial, it should be free to enjoin the merger until questions concerning *the basic validity of the inclusion order,* at least so far as impact on the Pennsylvania communities is concerned, have been resolved.

MR. JUSTICE DOUGLAS, dissenting in part in Nos. 778, 779, 830–836.

These cases present at least one serious problem under 49 U. S. C. § 5 (2). Section 5 (2)(a) authorizes two or more carriers to consolidate provided that the Commission finds under subdivision (b) that the "terms and conditions" are "just and reasonable" and "will be consistent with the public interest." Moreover, under subdivision (d) of § 5 (2), the Commission "as a prerequisite to its approval" of the merger may require the inclusion of another railroad in the territory "upon equitable terms."

I do not think the Commission has made those necessary findings under § 5 (2).

The majority opinion adopts a piecemeal approach to judicial review of the Commission's orders, which, as I view it, does not conform with our duty of judicial review in one respect.

In the majority opinion last Term, Mr. Justice Clark noted that "[o]ur experience with other mergers, and common sense as well, indicate that the 'scrambling' goes fast but the unscrambling is interminable and seldom effectively accomplished." *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S. 372, 392. Because of this, we refused to allow the Penn-Central merger to be consummated before the fate of the three protected roads (the Erie-Lackawanna, Delaware & Hudson, and Boston & Maine) had been determined. Some aspects of the Commission's merger and inclusion orders—those which do not go to the heart of the Commission's decision (that is, its determination that the merger or inclusion is in

the "public interest")—can await later judicial review. Examples would be the contentions of Reading and the E–L bondholders. But I fail to see how we can affirm the Commission's decision that this entire transaction is in the "public interest" without considering those points raised by the parties which do go to the heart of the controversy. I refer specifically to the contentions of the parties in the Middle District of Pennsylvania (see my partial dissent in Nos. 433, 663, Misc., and 664, Misc.), and to Nos. 830 and 831 which involve claims of the New Haven creditor interests, to which I now turn.

Certain bondholder interests of the New York, New Haven & Hartford Railroad Company (New Haven) attack the Commission's failure to provide for actual inclusion of the New Haven in the Penn-Central system as a condition simultaneous with, or precedent to, consummation of the merger. Following the filing of these appeals, the Commission, on November 16, 1967, issued a decision concerning the treatment of the New Haven in the merger plan, styling the opinion as a supplemental order in the *Penn-Central Merger Case. Pennsylvania Railroad Co.—Merger—New York Central Railroad Co.,* Finance Docket No. 21989, 331 I. C. C. 643. On that date the Commission approved as a first step in the New Haven's reorganization a conveyance of its assets to Penn-Central; it fixed terms for interim financing on the basis of a $25,000,000 loan commitment from Penn-Central; and it provided for the sharing of New Haven's operating losses by Penn-Central, on a sliding scale, pending New Haven's inclusion in the merged system. The Commission also specifically provided that consummation of the merger would constitute irrevocable assent by Penn-Central to enter into the interim financing arrangement.

The sale agreement proposed by the New Haven trustees provided for New Haven's physical assets and investments to be purchased by Penn-Central free and

clear of liens and other encumbrances. The lien of the New Haven creditors' interests would shift from New Haven's present assets to the assets held by the trustees as the proceeds of the sale. Provision for the preservation of priorities and rights of claimants was made in the plan. The trustees originally submitted, pursuant to § 77 of the Bankruptcy Act,[1] a plan of reorganization to be accomplished in two steps. Initially, only the first step, providing for the sale of the New Haven to the merged Penn-Central system, was presented to the Commission for approval. After that part of the plan had been completed, the trustees intended to implement the second step, relating to distributing the assets of the New Haven estate or issuing new New Haven securities.

Certain bondholder interests contested the legality of the two-step plan. But in a decision rendered in May 1967 the Court of Appeals held that a decision on the legality of such a plan would be premature. *In the Matter of the New York, New Haven & Hartford R. Co.,* 378 F. 2d 635 (C. A. 2d Cir. 1967). In September 1967 the New Haven trustees filed the second part of their plan, but requested the Commission to make immediate findings required under § 5 (2)(d) of the Interstate Commerce Act with respect to the first part of the plan, rather than await completion of the reorganization proceedings. Creditor interests opposed this request by arguing that creditor claims, in the order of priority, would have to be considered by the Commission before it could arrive at "equitable terms" within the meaning of § 5 (2)(d). The Commission chose to adopt the procedure suggested by the trustees, and approved the plan for the sale of assets independently of a complete reorganization plan.

In short, the Commission concluded that an immediate decision on the question under § 5 (2)(d) of "equitable

---

[1] 11 U. S. C. § 205. See also 49 U. S. C. § 20b.

terms" for the sale of assets would satisfy "a legal preliminary to NH inclusion without delay once the Penn-Central merger is consummated." [2]  On the other hand, it said, delay of such a decision until completion of New Haven's reorganization would prevent a timely rescue of the New Haven as an operating common carrier.  Thus, the Commission opted in favor of "improved service through a consummated Penn-Central merger including an operational NH, while the NH creditors are freed to litigate at will the distribution of their estate." [3]

The bondholder interests before this Court contend that under either the majority or dissenting opinions in *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, any sale of the New Haven to the merged Penn-Central system would require at least its submission to a vote of bondholders.  See also *Reconstruction Finance Corp.* v. *Denver & Rio Grande Western R. Co.,* 328 U. S. 495.  The bondholders also argue that the Commission ignored the admonition of this Court in *Palmer* v. *Massachusetts,* 308 U. S. 79, 88, that the powers of the Commission and courts under § 77 of the Bankruptcy Act can properly be exercised only in the context of "a complete plan of reorganization for an insolvent road."

In justifying its action, the Commission noted that except for subsections (b)(1), (4), and (5), of § 77, there is no provision in § 77 that deals specifically with the form or content of a reorganization plan.  Therefore, no language of § 77 was believed to prohibit evaluation of the New Haven properties and the approval of their sale before approval of a plan for restructuring the New Haven.  The Commission noted the doctrine

---

[2] *Pennsylvania Railroad Co.—Merger—New York Central Railroad Co.,* Finance Docket No. 21989, 331 I. C. C. 643, 653.

[3] *Id.,* at 653–654.

552

of "wasting assets" employed under Chapter X of the Bankruptcy Act to permit two-step plans of reorganization, and analogized that doctrine to the instant case— since in the view of the Commission, the New Haven could properly be classified as a "wasting asset." [4]

With respect to interim financing of the New Haven, the Commission approved a loan proposal under which Penn-Central would make available to the New Haven a total of $25,000,000 over three years to enable the New Haven to continue its operations until its assets were conveyed to Penn-Central. The Commission noted that the loan authorization did not impair the jurisdiction of the reorganization court since that court would still have to approve issuance of trustees' certificates to evidence those advances.[5]

The loan provisions approved by the Commission provided further that any time the cash balance of the New Haven fell below $5,000,000, the trustees could borrow

---

[4] *Id.*, at 112. With respect to the "wasting asset" doctrine in Chapter X proceedings, see, *e. g., In re The Sire Plan, Inc.*, 332 F. 2d 497 (C. A. 2d Cir. 1964); *In re V. Loewer's Gambrinus Brewery Co., Inc.*, 141 F. 2d 747 (C. A. 2d Cir. 1944).

[5] By an order dated December 19, 1967, the reorganization court (D. C. Conn.) authorized the New Haven Trustees to issue up to $25,000,000 in trustees' certificates to evidence any loans from Penn-Central obtained pursuant to the Commission's November 16, 1967 order. The court ordered that each certificate issued was to constitute an expense of administration equal in priority to other expenses of administration; and that the proceeds derived by the Trustees from the issuance of the certificates could be expended by them for purposes deemed necessary within their discretion (including current maintenance and operation expenses), subject to the supervision of the court. The court provided that the Trustees would not be required to seek any further authorization to make borrowings under the Penn-Central loan agreement; but it directed them to notify the court and the other parties concerned when they intended to take down a loan, and reserved jurisdiction to modify its order with respect to any of these future borrowings.

from the $25,000,000 commitment enough money to equal a $5,000,000 cash balance plus $2,500,000. The Commission set an interval of at least three months between loan takedowns, and provided that any reduction in the aid which New Haven was receiving from the New England States would reduce correspondingly the amount that could be borrowed from Penn-Central. The interest rate on the loans was declared to be the prime rate of the Morgan Guaranty Trust Company of New York City prevailing at the time the loan is taken down. December 13, 1971, was designated as the maturity date for the trustees' certificates. Finally, the loan provisions would be terminated upon the occurrence of any of the following events: (1) acquisition of the New Haven by Penn-Central; (2) a final and effective order by a regulatory authority or court granting permission to liquidate the New Haven or to dispose of it to someone other than Penn-Central; (3) cessation of the New Haven operation as a going railroad; (4) a determination that Penn-Central shall not acquire the New Haven; (5) the expiration of three years from the date of the Penn-Central merger.

Although the New Haven creditors argued before the Commission that their interests would be reduced by the issuance of the trustees' certificates, which would acquire precedence over their claims against the New Haven estate, the Commission reasoned that:

> "We consider such a result part of the process of distributing the burdens of the NH's operations. It is a fundamental aspect of our free enterprise economy that private persons assume the risks attached to their investments, and the NH creditors can expect no less because the NH's properties are devoted to a public use. Indeed, the assistance the creditors are receiving from the States and would

receive from Penn-Central through the sharing of operating losses would raise some of that burden from their shoulders." [6]

The Commission did not place all of New Haven's operating losses on Penn-Central during the period of the loan agreement. The amount to be absorbed by Penn-Central is governed by a specific formula approved by the Commission.[7] With respect to deciding how much of the loss was to be assumed by Penn-Central under the formula, the Commission noted two main factors: (1) the admonition of the reorganization court that safeguards against endless litigation by New Haven creditors should be established; and (2) in the interim period before conveyance of New Haven's assets to Penn-Central, the opportunities to integrate New Haven's operations into the Penn-Central system would be restricted, so that many operating economies and efficiencies could not be realized until complete inclusion of the New Haven. The Commission felt that the existence of these factors tended to limit the portion of New Haven losses which Penn-Central should have to absorb under the formula. The final amount decided upon was 100% of the loss during the first year, 50% during the second, and 25% during the third. Further, the Commission set $5,500,000 as the maximum Penn-Central share of operating losses in any one year.

Finally, the Commission provided that under the purchase agreement, the trustees' certificates evidencing the loans were to be offset in an amount equal to the operating loss absorbed by Penn-Central. The Commission asserted that the burdens on the New Haven creditors caused by the loan-loss absorption agreement would be relatively small—and not significantly different from the

---

[6] 331 I. C. C. 643, 704.

[7] See *id.*, at 717–720.

burdens under a lease agreement. The Commission expected that the total amount loaned by Penn-Central over three years would probably be "substantially less than $25 million." [8] It noted that the requirements for loans would increase in relation to the operating losses of the New Haven; but as the operating losses increased, Penn-Central would absorb a part of the increase. At the same time, the Commission pointed out that since the amount of losses to be assumed by Penn-Central would decline each year (from 100% to 50% to 25%), the creditors would have much to gain by speedily completing the reorganization proceedings.

The bondholder interests attack the operating loss provisions of the Commission's order—contending that Penn-Central should be required to absorb all the operating losses of the New Haven. They also assert that the purchase price approved by the Commission for the sale of New Haven assets to Penn-Central ($125,000,000, being the value of the consideration to be received by the New Haven) is too low. Further, as indicated above, they contend that the Commission is without authority to adopt a two-step reorganization plan which prevents the bondholders from voting on the first aspect of the plan—the sale of assets.

The New Haven trustees argue that the bondholders will have the opportunity to object to these actions of the Commission in the reorganization court and to seek judicial review of its action. Indeed, Oscar Gruss & Son (appellant in No. 830) and the Bondholders' Committee (appellant in No. 831) have indicated that they intend to seek judicial review of the November 16 order. The trustees also suggest that the questions presented involve only the quantum of consideration to be paid by Penn-Central in implementation of its eventual

---

[8] *Id.*, at 719.

take-over of the New Haven, and do not merit postponing consummation of the Penn-Central merger.

On the other hand, the bondholders contend that their objections to the Commission's November 16 order are so substantial that even if they have only partial success on judicial review, the feasibility of inclusion would be open to serious question. If inclusion of the New Haven in the Penn-Central system could not be accomplished, a major underpinning in the Commission's finding that the merger was in the public interest would be removed.[9] The New Haven might then have to be liquidated in the reorganization court. Perhaps eventual operation by the Federal Government, or by the States concerned, would be the outcome. In fact, appellant in No. 831 has pending before the reorganization court a petition for immediate liquidation of the New Haven. The bondholders, of course, seek to recover as much of their investment as possible. To the extent that any loans from Penn-Central to the New Haven would not be offset by Penn-Central's obligation to absorb a portion of the New Haven operating losses, the bondholders' equity would be diluted.

The Commission is commanded by § 5 (2)(d) of the Act to authorize inclusion of a road only on "equitable terms." [10] Are the operating loss provisions, as they

---

[9] The Commission authorized the Penn-Central merger, subject to the express condition (Condition No. 8, in Appendix A to its Report and Order dated April 6, 1966, *Pennsylvania Railroad Co.—Merger—New York Central Railroad Co.*, 327 I. C. C. 475, as modified in 328 I. C. C. 304 and 330 I. C. C. 328), that the merged system include the properties and operations of the New Haven. The Commission found that the merger would effectively destroy the ability of the New Haven to survive, and would not be in the public interest without the complete inclusion of the New Haven.

[10] 49 U. S. C. § 5 (2)(d). Section 5 (2)(b) authorizes acquisition of one carrier by another on terms which are "just and reasonable."

now stand, "equitable terms"? The provisions may well constitute a prelude to the slow bleeding or squeezing out of creditor interests, as their equity is diminished by loans.

High finance has a great inventive genius; and one does not have to be sophisticated to see how Penn-Central with the use of this loan device can pick up New Haven for a song.

The Commission has itself stated that the Penn-Central merger would not be in the public interest without the complete inclusion of the New Haven.[11] Clearly we should not approve this merger and decide that the mandate of § 5 (2)(b) has been fulfilled without at the same time concluding that the loan agreement and the sharing of the New Haven deficit are "equitable."

On its face the requirement that Penn-Central share the operating losses of the New Haven on a decreasing scale each year—from 100% to 50% to 25%—seems inequitable. Why a 100–50–25 formula? Why not 100–10–1 or 50–25–10 or 25–50–100? The Commission does not clearly indicate how it arrived at its 100–50–25 formula. Of the two factors mentioned by it in making its determination (preventing endless litigation by New Haven creditors, and the inability to realize many economies during the interim period before the sale of New Haven's assets to Penn-Central), only the first would appear to have any relation to the adoption of a sliding-scale formula.

On its face this formula for sharing of losses seems inherently coercive. It would indeed appear that the

See, e. g., *Schwabacher* v. *United States,* 334 U. S. 182; *Cleveland, C., C. & St. L. R. Co.* v. *Jackson,* 22 F. 2d 509 (C. A. 6th Cir. 1927); *Stott* v. *United States,* 166 F. Supp. 851 (D. C. S. D. N. Y. 1958).

[11] *Pennsylvania Railroad Co.—Merger—New York Central Railroad Co.,* 327 I. C. C. 475, 524.

Commission sought to force the creditors to accede to its proposal within a year. The pressure would indeed be great; for once the merger between Penn and Central is consummated, the New Haven creditors would have to absorb the losses of the New Haven at an increasing rate if they did not accept the Commission's proposal.

If that is the purpose and effect of this provision concerning Penn-Central's sharing of the operating losses of the New Haven, *the issue may well have spent itself, unless we grant judicial review prior to the consummation of the merger.* Of course, if the merger is approved, one way in which the coercive effect of this provision of the plan could be eliminated would be to undo the merger. But that gets back to the problem of unscrambling mergers of this kind and intricacy, once they are consummated—the difficulty emphasized by Mr. Justice Clark when the case was here before. 386 U. S. 372, 392.

The Court, while not presuming to approve the November 16, 1967, order of the Commission as prescribing "equitable terms" for inclusion, takes the position that the Commission has done all *that is required at this point* with respect to the inclusion of the New Haven. But I am unable to reconcile this position with the requirements of the statute, which directs in § 5 (2)(d) that a road may be included in another only upon "equitable terms."

The coercive nature of the operating loss provision may well frustrate effective judicial review once the Penn-Central merger is a fact.

On the other hand, if the creditor interests do challenge the Commission's order in the courts, and are successful, inclusion in the Penn-Central system on "equitable terms" at the time of that decision might well be impossible. The Commission itself seemed to recognize the possibility that the New Haven might not be included

in the Penn-Central system in its November 16 report,[12] although it evidently believed that the possibility of noninclusion did not justify delaying consummation of the Penn-Central merger. Such an approach is not permissible under the statutory scheme, when the Commission has stated that the Penn-Central merger would not be in the public interest unless the New Haven were included in that merged system. And, as the bondholders have noted, there exists a substantial doubt whether the inclusion of the New Haven on equitable terms as required by § 5 (2)(d) has been provided.

Is such a coercive provision an "equitable" term within the meaning of § 5 (2)(d)? Is "equitable" to be taken to mean what is a "fair" distribution of losses, risks, and burdens between the old creditor interests and the acquiring company? These are old and perennial problems in the reorganization and merger field. They involve a delicate weighing of legal rights and practical realities. How we can approve the merger under the statutory system without determining whether the loan provision and the provision for sharing of losses are "equitable" remains a mystery.

---

[12] In its summary of the contingencies upon which the obligation of Penn-Central to loan $25,000,000 to the New Haven would be terminated, the Commission included: "If a regulatory authority or court by a final and effective order grants permission to liquidate the NH or to dispose of it to someone other than Penn-Central"; and "If it should be determined that Penn-Central shall not acquire the NH."