**In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAIL-ROAD COMPANY, Debtor.**

**No. 30226.**

United States District Court
D. Connecticut.

Feb. 13, 1968.

See also, D. C., 278 F.Supp. 592.

Lester C. Migdal, Migdal, Low, Tenney & Glass, New York City, for First Mortgage Bondholders Committee.

Myron S. Isaacs, New York City, for Oscar Gruss & Son.

James Wm. Moore, New Haven, Conn., for trustees.

MEMORANDUM OF DECISION ON PETITION FOR ORDER #441; CROSS-PETITIONS OF FIRST MORTGAGE BONDHOLDERS COMMITTEE AND OF OSCAR GRUSS & SON FOR TERMINATION OF REORGANIZATION PROCEEDINGS, AND TRUSTEES' MOTIONS TO DISMISS THE CROSS-PETITIONS.

ANDERSON, Circuit Judge.*

On April 5, 1967 the Trustees for the Debtor in reorganization filed a petition requesting instructions from the court as to their future course of action. At that time the prospect for the continued operation of the Railroad was very dim. From the time when they were appointed in July of 1961, the Trustees had been of the opinion that the best means for assuring the survival of the New Haven lay in the direction of merger with a large trunkline railroad. They were the first to evince an understanding of this now obvious truth, and they were the first to propose intervention in the proceedings, instituted March 9, 1962, before the Interstate Commerce Commission for the merger of the Pennsylvania and New York Central Railroads, which culminated in the Commission's order that the New Haven must be included in that merger. At the time of their appointment the New Haven was losing cash at a rate of approximately $1,500,000 per month. This lethal attrition was in a few months not only arrested but the cash position was significantly improved over the ensuing years. Meanwhile, however, in spite of spartan economies and a sizeable reduction in numbers of employees, the costs of operation, chargeable prin-

* Sitting by designation.

cipally to various forms of competition and to repeated increases in payroll expenditures, brought about by settlements between the National Railway Labor Conference and the National Unions, offset savings and erroded away the accumulated cash. Cash assistance was sought from the Federal Government and the four States involved. The former furnished a guaranty for loans up to $12,500,000 but there were no grants of cash except that Connecticut continued its grant of $500,000 per year for maintenance of underpasses and bridges. Considering that the operation of the Railroad was of sufficient size to involve a payroll of $1,500,000 per *week,* it can be said that no substantial cash aid was forthcoming until mid 1965 when the four States agreed on contributions totalling approximately $5,500,000 per year which was only one-third to one-fourth of the New Haven's net operating losses.

The merger petition of the Pennsylvania and New York Central Railroads was approved by the Interstate Commerce Commission and an application to enjoin the immediate consummation of the merger was refused by a three-judge federal district court in the Southern District of New York, but on March 27, 1967 the Supreme Court reversed the judgment of the District Court and remanded the case to the Interstate Commerce Commission for further proceedings. Baltimore & Ohio Railroad Co. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967).

In Petition for Order #441 the Trustees of the New Haven recounted the continuing financial deterioration of the Railroad and estimated sizeable cash losses for 1967. They also mentioned the serious likelihood of protracted delay in the culmination of the Penn-Central merger and the inability of the New Haven to continue its operations short of tapping funds in the registry of the court. It was in the light of these circumstances that instruction from the court was sought. The cross-petitioners, First Mortgage 4% Bond-

holders Committee and Oscar Gruss & Son, asked either for an immediate takeover of the New Haven by the Penn-Central, once the merger was approved, or for the termination of the reorganization proceedings and liquidation of the Railroad. A partial hearing on petition for Order #441 was held.

Soon after the filing of the cross-petitions, however, it became apparent that an extraordinary effort was being made by the Interstate Commerce Commission and the parties in interest in the Penn-Central merger to accelerate the rehearing and disposition of the case on remand. The Commission issued its decision on the merger and allied matters on June 9, 1967 and, in expedited proceedings, the appeals were heard by a three-judge court in the Southern District of New York which rendered its decision on October 19, 1967 dismissing all of the complaints attacking the merger and inclusion orders and affirming the decisions of the I.C.C.

In view of these developments and the assurance from those representing the four States that every effort would be made to continue their cash assistance at approximately the same rates, the court postponed the completion of hearings on the petition for Order #441 and the cross-petitions, and in so doing denied several requests by the cross-petitioners to hold the hearings and terminate the reorganization proceedings.

In July, 1967, it had appeared likely that the cash would be so depleted that operation of the Railroad would have to be terminated by the end of September if by that time there was no improvement. At that time the court was not only concerned by the possibility that such a cessation of operations might be brought about by the loss of cash before the effective date of the Penn-Central merger, assuming that a favorable decision were handed down by the Supreme Court, but also by the lack of cash resources between the time of the merger and the date on which the operation of the New Haven would be taken over by the Penn-Central. Therefore,

on July 11th the court issued a partial ruling on the petition for instructions, calling for an application to the I.C.C. requesting the Commission to fashion, and implement with appropriate orders, a means which would insure the continuation of operations during the period following the merger. Ultimately this was provided by the order of the I.C.C. of November 16, 1967.

Actually by September, 1967, there was some increase in cash from various sources; and, by carefully husbanding its resources, the Trustees were able to keep the Railroad going through the balance of the year while the appeals from the judgments of the three-judge court in the merger and inclusion cases were taken to and heard by the Supreme Court. On January 15, 1968 that Court affirmed the judgments of the three-judge court.

The cross-petitioners have continued to urge that the reorganization proceedings be terminated and that the Railroad be liquidated. It is their position that a continuation of the operations of the Railroad at a loss constitutes a taking of their property without due process and without just compensation. The Trustees have moved to dismiss the cross-petitions for failure to state claims upon which relief can be granted.

From the time of the I.C.C.'s order of April 8, 1966, making inclusion of the New Haven a condition of the Penn-Central merger, to the present, every opinion of every court has accepted or expressly approved the inclusion of the New Haven in the merged Penn-Central system. The Supreme Court in its decision of January 15th, approving the Penn-Central merger and dealing with the present cross-petitioners' argument that inclusion of the New Haven should be required to take place coincidentally with the merger itself "because continued operation of the New Haven at a loss involves progressive erosion of the bondholders' security * * *", laid great emphasis on the importance of the public interest in the continued operation of the New Haven and quoted with approval the I.C.C.'s statement that, "It is a fundamental aspect of our free enterprise economy that private persons assume the risks attached to their investments, and the NH creditors can expect no less because the NH's properties are devoted to a public use." Penn-Central and N & W Inclusion Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (Jan. 15, 1968). It nowhere even remotely suggested that the interest of the bondholders could not or would not be protected by the regular proceedings before the I.C.C. and subject to review by this court or by a three-judge district court. Justice Fortas' opinion for the majority said:

"While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move."

Penn-Central and N & W Inclusion Cases, supra, 88 S.Ct. at 614.

The Commission has approved the first or vital portion of a two-step plan of reorganization, which is about to be certified to this court for review. The Commission has found that the plan of reorganization is feasible and that it is fair and equitable in its terms. The Supreme Court opinion made it abundantly clear that it approved the Commission's conclusion that the continuation of the operations of the New Haven was essential and this could be effectuated only by prompt consummation of the Penn-Central merger. It follows that the inclusion of the New Haven must be accomplished as soon as possible and that meanwhile the Trustees are expected to continue operating the New Haven. These are the objectives now to be pursued.

The cross-petitioners argue that the Supreme Court decision did no more than

decide at the time that "the Penn-Central merger should not be enjoined." But it should hardly be necessary to point out that the Court's opinion devoted a great deal of discussion to the circumstances of the New Haven Railroad and the affect of the merger upon it. The claims of the bondholders and their fears for the diminishing value of the New Haven's assets through continued deficit operations was expressly noted and considered. It said, "The bondholders' objections may be registered and adjudicated in the reorganization court or upon judicial review as provided by law." The cross-petitioners argue that the Supreme Court in using these words, has in effect, given its blessing to their present effort to have the reorganization proceedings terminated and to bring about the liquidation of the Railroad. But the Supreme Court opinion cannot be so interpreted. Its mention of the reorganization court and a reviewing court, i. e. a statutory three-judge court, as tribunals in which the bondholders' objections might be registered clearly refers to the present appeal from the I.C.C.'s order of November 16, 1967 and the certification of the approved plan to the reorganization court. It did not contemplate or consider a collateral attack such as that contained in the cross-petitions. The cross-petitioners argue that their petitions were filed in April, 1967, long before the I.C.C.'s order, and it should therefore have precedence. But the I.C.C.'s order was only a culminating step in the long and difficult struggle carried on by the Trustees of the New Haven and their counsel, beginning in June of 1962, for the inclusion of the Debtor in the Penn-Central merger. To jettison everything achieved and turn back just as a glimmer of light begins to show at the end of a long dark tunnel not only carries with it an aura of unreality but borders on the fantastic.

In any event, the cross-petitioners will have ample opportunity to present their claims of lack of due process and a taking of their property without just compensation before the reviewing courts, because, if the evidence in the record of the case before the I.C.C. shows without contradiction that the Commission's order is in violation of the bondholders' constitutional rights, it cannot stand, and the approved plan certainly cannot be found to be fair and equitable.

The real crux of the dispute here concerns the amount that the Penn-Central should be required to pay for the assets of the New Haven. This in turn depends largely on valuation. The cross-petitioners assert that the highest amount will only be realized through liquidation. They say that the I.C.C. fixed what they call the "net" liquidation value as of December 31, 1966 and that depletion since that date through operational losses has prejudiced their constitutional rights. But the I.C.C. obviously did not interpret its own report and order as conceding that its liquidation figure was as "net" as the cross-petitioners claim they made it. The Commission in its November 16, 1967 report said:

"If the creditors believe that it is to their advantage to have the reorganization proceeding dismissed and the NH liquidated in an equity proceeding, it is manifest that, unless the States were induced to maintain and, in fact, increase their aid, the creditors might well have to carry the NH's operating losses until those proceedings were completed and the NH were allowed to abandon its operations, even assuming the NH's creditors' position were sustained by the reorganization court and this Commission. It is clear to us from the record that the NH's creditors would not gain from such a procedure."

The cross-petitioners are apparently the only ones who seek liquidation. Neither the trustees for any of the series of bonds nor any other creditors have joined in the cross-petitions.

■ It would be an abuse of discretion and error on the part of this court to entertain and approve of action

by the cross-petitioners designed to scuttle the entire reorganization proceeding when such a course, which the I.C.C. has declared would, at best, be of no benefit to the creditors, was not indorsed by other representatives of the bondholders or creditors and at a time when the prescribed steps under § 77 of the Bankruptcy Act have reached their final stages and a plan of reorganization under the Act has been found to be feasible, and a specific plan has been approved and is about to be certified to this court. The cross-petitioners have no right to maintain what in essence is a collateral attack on the Commission's order and report which are subject to statutory provisions for direct review, toward which steps have already been taken. Moreover, the necessity for taking action on petition for Order #441, for instructions by the court to the Trustees for the Railroad, has passed. It is, therefore, ordered that the petition for Order #441 and the cross-petitions are dismissed.